*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-17018 |
| MEREDITH B. | ) ) | Superior Court No. 3AN-18-00302 PR |
| | ) ) ) ) | O P I N I O N |
| | ) | No. 7443 – April 24, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Emily L. Jura, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Meredith B. Anna Jay, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

BOLGER, Chief Justice.

## I. INTRODUCTION

The respondent in an involuntary commitment proceeding appeals the ex parte order authorizing her hospitalization for evaluation and the subsequent 30-day commitment order. The respondent argues that the screening investigation was inadequate because she was not interviewed. She asserts that, as a result, both the order hospitalizing her for evaluation and the 30-day commitment order should be reversed and

vacated. She challenges the 30-day commitment order on a second ground, arguing the superior court erred in concluding that (1) she was "gravely disabled" and (2) there was a reasonable expectation she could improve with treatment.

We conclude that the superior court's findings in the 30-day commitment order were supported by clear and convincing evidence. If there was an error during the screening investigation, the error was harmless, because the respondent had the opportunity to testify at the 30-day commitment hearing. We therefore affirm the 30-day commitment order.

## II.    FACTS AND PROCEEDINGS

In January 2018 Meredith's[1] sister and guardian, Sally, petitioned the superior court for an order authorizing Meredith's hospitalization for evaluation.[2] Sally's petition stated that Meredith suffered from bipolar disorder with delusions, post-traumatic stress disorder (PTSD), and an unspecified psychotic disorder. The petition alleged that Meredith stopped taking her prescribed medications for the disorders in approximately October 2016. The petition asserted that Meredith lived in an inoperable vehicle on her property in Houston, without heat, proper clothing, or toilet facilities.

In response to this petition, the superior court appointed a screening investigator to prepare a report.[3] The investigator interviewed Meredith's daughter and Sally by telephone. Both women attested to their concerns regarding the severity of Meredith's impairment and the risks her behavior posed to her life and health. The

---

[1]    Pseudonyms are used to protect the privacy of the respondent and her family.

[2]    *See* AS 47.30.700(b) (addressing petition's requirements).

[3]    *See* AS 47.30.700(a) (requiring a screening investigation upon receipt of petition).

screening investigator also consulted with a facility where Meredith previously received behavioral health services.  The facility's records confirmed Meredith's diagnoses and her cessation of treatment.  The screening investigator did not interview Meredith while preparing the report because "[n]o contact information [was] available."

Based on the screening investigator's report, on January 30, 2018, the superior court ordered Meredith's hospitalization for evaluation.  In its order, the superior court indicated that an interview with the respondent was not reasonably possible, noting there was "[n]o contact information."  Meredith was admitted to Alaska Psychiatric Institute (API) later that day.  After evaluating Meredith, API filed a petition for a 30-day commitment.

A magistrate judge held a 30-day commitment hearing on February 1.  Meredith, Sally, and Dr. Robert Long, Meredith's treating doctor at API, testified at the hearing.  Sally testified that Meredith was living in an inoperable vehicle with no heat source and that Meredith used jackets to cover a front window that was either broken or never rolled up.  She explained that as far as she was aware, Meredith had not left the vehicle in several months, even to use the toilet, and that as a result "the smell of feces and urine is so strong that it's – it's overpowering just to stand outside the window and to talk to her."  Sally stated that Meredith lived in the vehicle "naked, covered with blankets" and did not "want to put any clothes on."  Sally testified that Meredith refused to move from the vehicle to a more secure location, such as an apartment or assisted living facility, despite Sally's offer to secure financial resources and arrange the move.  Meredith also declined to see a doctor.

Sally testified that it appeared the doors on the vehicle had frozen shut and that Meredith was either unable or unwilling to exit the vehicle.  Sally stated Meredith's family members brought food to the vehicle and passed it through the open window.  In Sally's opinion, Meredith would not take care of her basic needs if family stopped

bringing her supplies. Sally also noted that although Meredith usually took the food that family members provided, she sometimes would not eat it, stating that it was "tainted" and people were "trying to poison her." Finally, Sally shared her concern that Meredith would freeze to death in the vehicle over the winter.

Dr. Long testified that he was Meredith's current psychiatrist and had treated her during her most recent prior admission in October 2017. He stated that the evaluation period was Meredith's seventh admission to API and that Meredith's diagnosis was schizophrenia, paranoid type. He testified that during the evaluation period Meredith had disorganized thoughts, was unable to care for herself, demonstrated minimal rational judgment, and often responded with "nonsensical speech" or with answers that had "nothing to do with the question . . . asked." Dr. Long stated that she had been unable to coherently discuss her mental health during the evaluation period, but he noted that on her most recent previous admission, she had denied she had a mental illness or needed medication. As a result, he believed that she was incapable of meeting her basic needs.

Dr. Long noted that Meredith smelled potently of urine and feces when she arrived at API and that this lack of personal hygiene presented a risk of "infections, both internally as well as skin infections." He also noted that Meredith "frequently has paranoia about her food, that it's being tainted or poisoned, medication[s] are tainted or poisoned, and so, therefore, she's hesitant to eat, hesitant to take meds." He testified that Meredith had been off all of her prescribed medications since October 2016, but that family members indicated she was much more independent when she was taking medications.

Dr. Long testified that "[a] less restrictive environment does not exist" to get Meredith the help that she needs. When asked whether outpatient treatment could meet Meredith's needs, he reasoned that it was not a viable option because of her history

of refusing to use an outpatient provider. Based on API's records, the doctor assessed her "current level of functioning" as the worst it had ever been. He explained that "[g]etting back to baseline is harder and harder" when bipolar disorder and schizophrenia are left untreated. Dr. Long opined that Meredith "has tremendous room for improvement," but that without treatment she will likely "get worse and worse over time." He believed that Meredith could improve with treatment because her cognition had improved during her previous admissions to API.

Meredith also testified at the 30-day commitment hearing. When questioned about how she ended up living in the vehicle, Meredith responded, "I didn't stay in the car until I woke up one morning in the car and realized it felt like I had surgery on my body, and then I realized I was missing my whole kidney it seemed like." And when asked if she was ready to return to her property, Meredith replied that she "smelled chloroform" in her vehicle, which is what happens "when they take out your black market organs," and it felt "like I've had a bunch of hammers and sledgehammers on my body."

The magistrate judge recommended granting the petition because it was a "very clear case of grave disability": Meredith was in real danger of physical harm arising from such complete neglect of basic needs for food, shelter, clothing, or personal safety to render serious accident, illness, or death highly probable if care was not provided.[4] The magistrate judge further noted Meredith's recent deterioration: She was "living in her own feces, her own urine" in an unheated vehicle that she refused to leave and was at risk of starving or freezing to death. The magistrate judge reasoned, based on the testimony of Dr. Long and Sally, that Meredith could benefit from treatment at API because she had improved during her prior admissions. The magistrate judge

---

[4]    *See* AS 47.30.915(9)(A) (defining "gravely disabled").

additionally cited the testimony that Meredith was able to live independently when taking her medications.

The superior court adopted the magistrate judge's proposed findings that Meredith was gravely disabled under AS 47.30.915(9)(A) and ordered a 30-day commitment at API. In the 30-day commitment order the court found that Meredith suffered from schizophrenia accompanied by paranoia, that she met the criteria for grave disability, and that her mental illness placed her in danger of physical harm due to her complete neglect of her own basic needs.

Meredith appeals.

## III. STANDARD OF REVIEW

We review the superior court's factual findings in involuntary commitment proceedings for clear error.[5] Those findings are reversed only if we have a "definite and firm conviction that a mistake has been made."[6] Whether those findings meet the statutory requirements for involuntary commitment is a question of law to which we apply our independent judgment.[7] The independent judgment standard also applies to questions regarding the interpretation of statutory provisions: We adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[8]

---

[5] *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019).

[6] *Id*. (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[7] *Id*. at 923-24 (citing *In re Jacob S.*, 384 P.3d at 764).

[8] *Id*. at 924 (quoting *In re Jacob S.*, 384 P.3d at 764).

## IV.    DISCUSSION

### A.    The Superior Court Did Not Err In Finding By Clear And Convincing Evidence That Meredith Was Gravely Disabled.

Based on evidence presented at the 30-day commitment hearing, the superior court determined that Meredith was gravely disabled under AS 47.30.915(9)(A). Meredith argues that the superior court's determination that she was "gravely disabled" was erroneous.  She contends that the State did not meet its burden of proving that she "[could] not survive safely in freedom with support" from her family.  Meredith asserts that the evidence establishes only that she "was homeless and withdrawn from society," not that she "would likely be seriously harmed due to neglect of her basic needs given her existing community support."  She notes that she was not "malnourished, dehydrated, or even underweight upon her arrival at API," nor had she suffered from an infection after living in excrement in the vehicle for several months.  Thus, she argues, serious illness or death was not "highly probable."

Alaska Statute 47.30.915(9)(A) defines "gravely disabled" as "a condition in which a person as a result of mental illness" is "in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken."  "Before the superior court can involuntarily commit a person it must find, by clear and convincing evidence, that the person is 'mentally ill and as a result is likely to cause harm to [self] or others or is gravely disabled.' "[9]  Clear and convincing evidence is "that amount of evidence which produces . . . a firm belief or conviction about the

---

[9]    *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 86 (Alaska 2012) (quoting AS 47.30.735(c)).

existence of a fact to be proved."[10]  Our "precedent makes clear that the court's consideration of less restrictive alternatives to confinement, including whether the person is 'helpless to avoid the hazards of freedom . . . with the aid of willing family members or friends,' must be a prerequisite to commitment in order for the process to be constitutionally sound."[11]

There was clear and convincing evidence presented at the 30-day commitment hearing to support the superior court's finding that Meredith was "gravely disabled."  The testimony of Sally, Dr. Long, and Meredith herself creates a firm belief that Meredith was in danger of physical harm as a result of her mental illness due to neglecting her basic needs for food, clothing, shelter, and personal safety.  Dr. Long testified that Meredith suffered from paranoid schizophrenia and had not taken medication since October 2016.  His opinion was that Meredith was incapable of meeting her basic needs and that "[a] less restrictive environment d[id] not exist" to provide Meredith with the help she needed.

As the superior court noted, the evidence demonstrated that "[f]or several months prior to hospitalization" Meredith was living "naked in an inoperable automobile with a broken window and no heat source."  Meredith relied on nothing but blankets to keep warm inside the vehicle during the winter.  And "[t]he vehicle was filthy with [her] urine and feces."  Meredith suffered from "paranoia about her food, that it's being tainted or poisoned," and even when family members brought her food they could not be certain that she would eat it.

---

[10]     *Id.* at 87 (quoting *In re Johnstone*, 2 P.3d 1226, 1234-35 (Alaska 2000)).

[11]     *In re Hospitalization of Mark V.*, 375 P.3d 51, 58 (Alaska 2016), (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007)), *abrogated by In re Naomi B.*, 435 P.3d at 924.

Meredith argues that this evidence could be read to show that she is homeless and withdrawn instead of "gravely disabled." However we "will not reweigh [the] evidence if the record supports the court's finding."[12] Clear and convincing evidence supports the superior court's finding that as a result of her mental illness Meredith was in danger of physical harm due to her neglect of her basic needs for food, clothing, shelter, or personal safety so as to render serious accident or illness highly probable.[13] We therefore conclude that the superior court did not clearly err in finding that Meredith was "gravely disabled."

## B. The Superior Court Did Not Err In Finding By Clear And Convincing Evidence That There Was A Reasonable Expectation Of Improvement With Treatment.

Meredith argues that the superior court "erred in concluding that there was a likelihood that [she] would improve with treatment at API given the evidence that medication was essential to improving [her] condition and the absence of testimony establishing that API planned to medicate [her] upon her commitment." The State responds that Dr. Long testified that "[Meredith]'s current diagnosis was consistent with her previous admissions to API, that [she] had shown improvements in cognition with treatment during her previous admissions, and that he believed [she] had scope for improvement again during this admission." The State asserts that Dr. Long's testimony is sufficient to support the court's finding that Meredith's condition could be improved with treatment at API.

We have held "that when the State seeks to commit a mentally ill person on a theory of grave disability, it must prove a reasonable expectation of improvement

---

[12] *In re Hospitalization of Connor J.*, 440 P.3d 159, 166 (Alaska 2019) (quoting *In re Jacob S.*, 384 P.3d at 766).

[13] *See* AS 47.30.915(9)(A).

with treatment."[14] In reaching this conclusion we reasoned that "[r]equiring the State to prove that treatment definitely would improve [the respondent's] condition would be a tall order, and one that medical science might struggle to fulfill even under ideal circumstances."[15] The State thus did not have to prove that Meredith *would* improve with treatment; rather, the State had to prove, by clear and convincing evidence, "that there was reason to believe that [Meredith's] mental condition *could* be improved by the course of treatment sought."[16] We review the superior court's chance-of-improvement finding for clear error.[17]

Although Meredith is correct in her assertion that Dr. Long indicated medications would be important for her cognitive improvement, his testimony also supported the conclusion that her mental condition would only worsen if she were left in the vehicle. Meredith had declined to participate in outpatient treatment options, had refused to take her medications since 2016, and was incapable of meeting her basic needs. Dr. Long's testimony provided clear and convincing evidence that Meredith's condition could improve with treatment: His opinion was that "[s]he has tremendous room for improvement" and that it was reasonable to believe that she could improve at API given her cognitive improvements during past admissions to API.

Based on this record, we conclude that there was clear and convincing evidence supporting a reasonable expectation of improvement in Meredith's mental condition after treatment at API. The superior court's finding was therefore not clearly erroneous.

---

[14]     *In re Hospitalization of Darren M.*, 426 P.3d 1021, 1030 (Alaska 2018).

[15]     *Id.* at 1031.

[16]     *Id.* (emphasis added).

[17]     *Id.* at 1027, 1031.

**C.** **Any Error In The Screening Investigation Was Harmless Because Meredith Had The Opportunity To Testify At The 30-Day Commitment Hearing.**

Meredith contends that the statutory requirements for a screening investigation under AS 47.30.700 were not met: specifically, that it was erroneous for the superior court to find that it was not "reasonably possible" to interview her.[18] Meredith asserts that an interview would have been "reasonably possible" because her whereabouts were not in question: Meredith's family consistently stated that she rarely, if ever, left a stationary vehicle on her property. She argues that due to the lack of interview during the screening investigation, she was hospitalized for evaluation and subsequently involuntarily committed for 30 days. Thus, she asserts, the order authorizing hospitalization for evaluation should be reversed and vacated, and the 30-day involuntary commitment order should be vacated because it was predicated on the initial hospitalization.

In previous appeals of orders authorizing hospitalizations for evaluation, we have applied a harmless error analysis to the failure to interview the respondent during the screening investigation.[19] Past cases concerned only orders authorizing hospitalization for evaluation: The respondents were not subsequently committed under

---

[18] *See In re Hospitalization of Heather R.*, 366 P.3d 530, 533 (Alaska 2016) (explaining that "a screening investigation should omit an interview with the respondent only if such an interview would not be reasonably possible").

[19] *See, e.g.*, *In re Hospitalization of Paige M.*, 433 P.3d 1182, 1188 (Alaska 2018) (evaluating whether failure to conduct adequate screening investigation was harmless error); *In re Heather R.*, 366 P.3d at 533-34 (determining failure to interview respondent was not harmless error).

a 30-day order.[20]  Meredith's case presents a different scenario, as she argues that both the order authorizing hospitalization for evaluation and the subsequent 30-day commitment order should be vacated on the basis of an asserted deficiency in the initial screening investigation.

The process for involuntary commitment of a person for mental health treatment involves a series of procedural steps and hearings.  Upon receiving a petition to hospitalize a person for evaluation, the superior court is required to conduct a screening investigation or to order a mental health professional to do so.[21]  Before granting such a petition the court must find based on the investigation that there is "probable cause to believe the [person] is mentally ill and that condition causes the [person] to be gravely disabled."[22]  If, after the person is hospitalized for evaluation, the evaluator concludes that treatment and hospitalization are needed, the evaluator may petition for a 30-day commitment order.[23]

Upon receiving a commitment petition, the superior court must schedule a hearing to determine, as required by statute, whether the person should be involuntarily committed to a mental health treatment facility for up to 30 days.[24]  The respondent has a number of rights at the hearing, including the right to assistance of counsel, to testify and present witnesses, and to confront and cross-examine the petitioner's witnesses.[25]

---

[20]     *In re Paige M.*, 433 P.3d at 1184-85; *In re Heather R.*, 366 P.3d at 531.

[21]     AS 47.30.700(a).

[22]     *Id.*

[23]     AS 47.30.730(a).

[24]     AS 47.30.735.

[25]     AS 47.30.735(b).

The court must find, by clear and convincing evidence, that the petitioner has demonstrated that the respondent is mentally ill, and, as a result, likely to cause harm or is gravely disabled.[26] The burden of proof in a commitment hearing is thus higher than the probable cause required to order a mental health evaluation.

The relationship between the evaluation procedure and the procedure for involuntary commitment resembles the relationship between proceedings in a child in need of aid (CINA) case. Like involuntary commitment proceedings, CINA cases have initial probable cause hearings followed by later dispositional hearings that require a higher burden of proof.[27] And weighty interests are undeniably at stake in both CINA cases and involuntary commitments. "[W]e have characterized involuntary commitment for a mental illness as a 'massive curtailment of liberty.' "[28] And "[i]t is well established that the interest in the care and custody of one's own child is the most basic of all civil liberties and 'a fundamental right recognized by both the federal and state

---

[26] AS 47.30.735(c).

[27] *See, e.g.*, *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 610 (Alaska 2007) (applying clear and convincing evidence standard to assess findings supporting termination of parental rights); *D.E.D. v. State*, 704 P.2d 774, 782 (Alaska 1985) (noting that any errors in temporary custody hearings were cured by procedurally correct final dispositional hearing).

[28] *In re Hospitalization of Naomi B.*, 435 P.3d 918, 931 (Alaska 2019) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375-76 (Alaska 2007)).

constitutions.' "[29] We have emphasized that the "interest of a parent facing termination proceedings is 'of the highest magnitude.' "[30]

We have long recognized that errors in a probable cause hearing are generally cured by an error-free trial on a petition to adjudicate a child in need of aid.[31] We have concluded that a mother's claims "concerning the department's decision to take custody of [her daughter] and the probable cause hearing [were] moot in light of the superior court's later decision adjudicating [the daughter] a child in need of aid."[32] And in *D.E.D. v. State* we "conclude[d] that even if the procedural and jurisdictional defects asserted . . . existed in the earlier temporary custody hearings, they were cured by the subsequent procedurally correct final dispositional hearing."[33]

If procedural defects in temporary custody hearings may be cured by later procedurally correct final dispositional hearings, then defects in an initial screening investigation may also be cured upon a procedurally correct 30-day commitment hearing. We therefore conclude that if there was an error in the lack of an interview during the screening investigation, the error was harmless. Meredith had the opportunity to testify at the 30-day commitment hearing and the superior court made the 30-day commitment

---

[29] *Sarah A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 427 P.3d 771, 778 (Alaska 2018) (quoting *Dennis O. v. Stephanie O.*, 393 P.3d 401, 407 (Alaska 2017)).

[30] *Id.* (quoting *In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991)).

[31] *Alyssa B.*, 165 P.3d at 610; *D.E.D.*, 704 P.2d at 782.

[32] *Alyssa B.*, 165 P.3d at 610.

[33] 704 P.2d at 782.

findings based on a higher burden of proof than was required for the evaluation order.[34]

## V.    CONCLUSION

We AFFIRM the superior court's 30-day commitment order.

---

[34]    Although we conclude the lack of a screening interview was harmless, we caution courts considering an evaluation petition to confirm that an interview with the respondent would not be reasonably possible. An indication of what efforts were made to contact the respondent for an interview, or why further efforts were not reasonably possible under the circumstances, is instrumental to this inquiry. As we have previously emphasized, "a screening investigation *should* include an interview in all instances in which it is possible to conduct one." *In re Hospitalization of Paige M.*, 433 P.3d 1182, 1187 (Alaska 2018) (emphasis in original).