*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-17215 |
| RABI R. | ) ) | Superior Court No. 3AN-18-01802 PR |
| | ) ) ) ) | O P I N I O N |
| | ) | No. 7474 – July 31, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Peterson, Judge.

Appearances: Rachel E. Cella, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Rabi R. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

CARNEY, Justice.

## I. INTRODUCTION

A man appeals superior court orders authorizing his hospitalization for evaluation, his 30-day commitment, and the involuntary administration of psychotropic medication. He argues that the superior court's failure to conduct a screening investigation was an error that requires vacation of the evaluation order and the commitment and medication orders that followed it. He also specifically challenges the commitment order, claiming that the court erred by relying on facts not in evidence and

by finding clear and convincing evidence that he was gravely disabled and that commitment was the least restrictive alternative. Finally, he challenges the order authorizing involuntary administration of medication, arguing that the superior court erred by finding clear and convincing evidence that it was in his best interests and that there was no less intrusive alternative available.

We conclude that failing to perform a screening investigation was error, but the error is harmless because the court made findings supported by clear and convincing evidence when ordering a 30-day commitment. We conclude that it was also harmless error to rely to any extent on facts not in evidence because there was sufficient evidence in the record to support a finding that the respondent was gravely disabled. We further conclude that the superior court did not err when it found by clear and convincing evidence that the respondent was gravely disabled and that commitment was the least restrictive alternative, or when it granted the petition for involuntary hospitalization. We finally conclude that the court did not err by finding that medication was in the respondent's best interests and that there was no less intrusive alternative, or by granting the petition for its involuntary administration. We therefore affirm the superior court's orders.

## II. FACTS AND PROCEEDINGS

### A. Facts

In early July 2018 Rabi R.[1] sought treatment at the Providence Alaska Medical Center emergency room for a sunburn. Medical staff believed that Rabi was unable to care for himself and filed a non-emergency petition for an order authorizing his hospitalization for evaluation. The petition alleged that Rabi, who had been previously diagnosed with schizophrenia, arrived at the hospital sick, covered in vomit

---

[1] We use a pseudonym to protect the respondent's privacy.

and feces, sunburned, and with open sores on his inner thighs and had lost 26 pounds in the six weeks prior to his arrival. The evaluation petition also noted Rabi had been hospitalized for "49 of the past 57 days" and had "been unable to maintain in the community independently."

The superior court neither performed a screening investigation nor ordered that a mental health professional perform one,[2] but granted the petition on July 10 based solely on the allegations in the petition. The court ordered that Rabi be transported to the first available evaluation facility.

Rabi was transferred to the Alaska Psychiatric Institute (API) a few days later. Upon arrival he was evaluated by an API psychiatrist. The psychiatrist's report noted that Rabi was alert, oriented, logical, coherent, goal-directed, and in no acute physical distress. The report also noted that Rabi's thought content and responses were appropriate to questions asked, and that Rabi denied hallucinations and appeared to have reasonable insight into his illness.[3]

Two days after he arrived at API a second psychiatrist assumed responsibility for Rabi's treatment. When he spoke with Rabi, Rabi claimed to be healthy and ready to leave API and was not interested in treatment for any conditions. Rabi acknowledged past problems, but asserted he was currently doing well. He insisted

---

[2] *See* AS 47.30.700(a) ("Upon petition of any adult, a judge shall immediately conduct a screening investigation or direct a . . . mental health professional . . . to conduct a screening investigation of the person alleged to be mentally ill and, as a result of that condition, alleged to be gravely disabled or to present a likelihood of serious harm to self or others.").

[3] In expert testimony during the commitment hearing, a second psychiatrist relied on this information noted in Rabi's chart. *See* Alaska R. Evid. 703 (stating that facts or data on which expert bases opinion or inference need not be admissible in evidence, but must be of type reasonably relied upon by experts in field).

that if released he would be able to return to a hotel and take care of himself, just as he had done prior to his arrival at the emergency room.

In contrast to the first psychiatrist's assessment and Rabi's statements, the second psychiatrist did not believe that Rabi was well enough to leave API. Based upon his interviews with Rabi and review of Rabi's medical history, the second psychiatrist filed petitions requesting an order committing Rabi to API for 30 days and an order permitting API to involuntarily administer psychotropic medication to Rabi. The commitment petition alleged Rabi was suffering from schizophrenia and as a result was gravely disabled and unable to care for himself. It stated that Rabi had been repeatedly hospitalized for schizophrenia, "was disheveled, odoriferous, and minimally verbal," and had been "found covered in feces and vomit." It also alleged that Rabi refused to shower because he could not open his hands and that he believed he could cure his illness through fasting and prayer. The medication petition noted that Rabi refused antipsychotic medication after being provided information on its risks and benefits,[4] but that the second psychiatrist believed Rabi was "incapable of giving or withholding informed consent." The petition stated that medication was necessary to treat Rabi's "[i]mpairment of executive function" and his "inability to decide to care for himself."

---

[4] *See* AS 47.30.837(b); *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 243 (Alaska 2006) (requiring treatment facilities to provide such information to patients).

## B. Proceedings

### 1. Petition hearings

A standing master heard both the commitment and medication petitions on July 18, the day they were filed.[5] The second psychiatrist and Rabi testified at both of the hearings. The court visitor who interviewed Rabi testified at the medication hearing.[6]

The psychiatrist testified about Rabi's condition when he arrived at the hospital, his previous diagnoses, and described Rabi's symptoms of schizophrenia. After noting that this was Rabi's "fourth hospitalization in recent history," the psychiatrist stated that when he arrived, Rabi's clothing was soiled with feces and vomit. He also described Rabi's history of catatonia and how at times Rabi was unable to open or use his hands. Based on Rabi's condition and Rabi's belief that he was "fine," the psychiatrist testified that Rabi was gravely disabled and would be unable to take care of himself if he were released from the hospital.

Rabi testified next. He stated he was ready to leave the hospital that day, and that he had gone to the emergency room only to get treated for a sunburn. He told the court he would be able to find shelter and buy groceries, and that he knew where to obtain outpatient mental health services.

---

[5] A court must address commitment and medication petitions separately. *See In re Hospitalization of Naomi B.*, 435 P.3d 918, 934 (Alaska 2019) (concluding that "[a]fter a court has ordered an individual involuntarily committed," it may also order administration of medication if petitioner proves that individual lacks capacity to give informed consent and medication "is in the best interests of the patient and that no less intrusive alternative treatment is available").

[6] The court must appoint an independent court visitor to investigate whether a respondent to an involuntary medication petition has capacity to give or withhold informed consent to administration of medication. AS 47.30.839(d).

After their testimony, the standing master made oral findings and recommended granting the petition to commit Rabi to API for 30 days. The standing master found that Rabi suffered from a mental illness — schizophrenia — based upon the psychiatrist's expert testimony and Rabi's prior diagnoses. The standing master also found that Rabi was gravely disabled under the second definition in AS 47.30.915(9) and that Rabi would continue to suffer "extreme and abnormal distress" without treatment.[7] In support of her findings the master relied on Rabi's "inability or unwillingness to open his hands," his refusal to shower, his belief that he had been in good enough shape to be out in the community upon his arrival to API, and his belief that he was well enough to leave API on the date of the hearing. Although she acknowledged that Rabi "look[ed] clean [and] put together" at the hearing, the standing master noted that he had been holding his hands in an unnatural manner consistent with the psychiatrist's description and his concern that Rabi's condition could develop into catatonia.

A hearing on the petition for involuntary medication was held next. The court visitor testified, as well as Rabi and the psychiatrist. The court visitor testified that Rabi did not recognize that he was experiencing symptoms of mental illness or that he required treatment and therefore had no insight as to his mental illness. As a result, she concluded that Rabi was unable to give informed consent to medication. The psychiatrist testified next. He detailed Rabi's prognosis with and without treatment and explained

---

[7]     The statute's second definition states that a person is gravely disabled if, as a result of mental illness, the person "will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently." AS 47.30.915(9)(B). We clarified that the level of distress must be such that the person cannot "live safely outside of a controlled environment." *In re Naomi B.*, 435 P.3d at 932 (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013)).

that Rabi would benefit from treatment with the medications proposed in the petition — Risperdal and olanzapine. He described the medications' likely effects, potential side effects, and interactions with other drugs, and testified about alternative treatments and their risks.

Rabi testified after the psychiatrist. He acknowledged that he experienced some symptoms of schizophrenia such as "think[ing] to [him]self loudly" and "talk[ing] to [him]self" but stated he did not want to take medications because they would "further disable" him. He also testified about side effects such as "fogginess" and inability to function from a medication he had previously been prescribed. The standing master took the medication petition under advisement.

The next day the standing master issued two written orders, one documenting her recommendation that Rabi be committed to API for 30 days and the other recommending that the superior court grant the medication petition. The master's recommendation for commitment repeated the oral findings that Rabi was suffering from schizophrenia and as a result was gravely disabled and unable to meet his basic needs for "clothes, hygiene[,] and possibly nutrition."

In the medication order the standing master found by clear and convincing evidence that Rabi was "not competent to provide informed consent concerning administration of psychotropic medication" because he lacked insight into his mental illness. The master found that Rabi's "inability to appreciate his mental illness" and symptoms made it "impossible" for him to "participate in treatment decisions with a rational thought process." The standing master noted that Rabi's "cursory acknowledgment" of his mental illness during the medication hearing was "unconvincing." And she concluded that Rabi had been provided with the required written information about the proposed medications.

## 2. Superior court review

Rabi filed written objections to the standing master's recommendations and requested review by the superior court.[8] After conducting an independent review of the hearings, the court issued an order on August 3 adopting the standing master's recommendations.

The superior court found clear and convincing evidence that Rabi suffered from schizophrenia and as a result was gravely disabled based on the psychiatrist's expert testimony. The court cited his testimony that Rabi was "living marginally, not cleaning himself, and not caring for himself in a safe and socially acceptable manner." The order noted Rabi's condition when he arrived at Providence: clothing covered in vomit and feces and with open sores on his legs, putting him at risk of infection. The court identified Rabi's "inability to care for himself [as] an underlying issue of his mental illness." The court found that Rabi's idea of returning to his hotel was not a solution because he had been in such a living situation before he arrived at the emergency room in distress. The court also noted the psychiatrist's testimony that Rabi had at times been unable to move and been found lying in the road and unable to control his movements, and the standing master's observation that Rabi's hands had been clasped in an unnatural way at the hearing as additional indications that Rabi was gravely disabled.

The court also found that, even though the psychiatrist had acknowledged Rabi had "reasonable insight into his illness" and was not showing some of the signs of schizophrenia upon his arrival to API, Rabi's failure to acknowledge his physical and mental condition was additional evidence that he was gravely disabled. Rabi's belief he

---

[8] *See* Alaska R. Civ. P. 53(d)(2)(B) (stating that if objections to a master's report are filed, "[t]he court must consider under a de novo standard of review all objections to findings of fact made or recommended in the report, and must rule on each objection").

was healthy, showering, and ready to be released from API and Providence showed he was "suffering when out in the community" and unable to care for himself in a socially acceptable manner as a result of his illness. The court also found that Rabi's inability to explain how his condition had changed, in light of the fact that he had been hospitalized for most of the previous 57 days, indicated that he was gravely disabled. The court further found by clear and convincing evidence that API was the least restrictive treatment alternative for Rabi based on the psychiatrist's testimony that Rabi would improve with medication and that Rabi had improved in the past while taking medication.

The superior court then adopted the standing master's medication order. It found by clear and convincing evidence that Rabi lacked the capacity to give or withhold informed consent, agreeing with the court visitor and the treating psychiatrist that Rabi did not recognize he was suffering from mental illness. Like the standing master, the court found "unpersuasive" Rabi's acknowledgment during the medication hearing that he was suffering from mental illness and experiencing symptoms. The court described Rabi's "version of his symptoms [as] further support . . . that [he] is unable to appreciate his mental illness or the severity of his symptoms."

Based upon the psychiatrist's testimony that Rabi would continue to "spiral" downward without medication and that Rabi would be able to make informed decisions and care for himself after he received treatment, the superior court found by clear and convincing evidence that there were no less intrusive means for effective treatment and that the proposed medication was in Rabi's best interests. The court noted the psychiatrist's testimony that he believed the benefits of treatment outweighed the risks. The court also found Rabi had been provided all required written information about the medications. It rejected Rabi's objections and adopted the standing master's orders.

Rabi appeals the evaluation, commitment, and medication orders.

## III.  STANDARD OF REVIEW

We review a trial court's "[f]actual findings in involuntary commitment or medication proceedings . . . for clear error."[9]  "[W]e reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[10]  "We grant 'especially great deference' when the 'findings require weighing the credibility of witnesses and conflicting oral testimony.' "[11]  However, whether these factual findings satisfy the statutory requirements for involuntary commitment and medication is a question of law that we review de novo.[12]

## IV.  DISCUSSION

### A.  The Failure To Perform A Screening Investigation Was Harmless Error.

Rabi argues that the superior court's failure to conduct or order a mental health professional to conduct a screening investigation was error.[13]  The State contends that the failure to conduct a screening investigation was not error because the petitioner

---

**9**      *In re Hospitalization of Danielle B.*, 453 P.3d 200, 202 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

**10**     *Id.* (quoting *In re Jacob S.*, 384 P.3d at 764).

**11**     *Id.* at 202-03 (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

**12**     *Id.* at 203.

**13**     After the parties filed their briefs, we decided *In re Hospitalization of Meredith B.*  462 P.3d 522 (Alaska 2020).  In that case, we concluded that the relationship between the evaluation and involuntary commitment procedures was similar to that between probable cause and later dispositional hearings in child in need of aid (CINA) cases.  We therefore determined that harmless error review is appropriate in this context as it is in CINA cases.  *Id.* at 527-29.

had interviewed Rabi the same day the hearing was held, making a post-petition investigation superfluous. The State also argues that even if the failure was error, the court subsequently made findings based on a higher standard of proof at the commitment hearing, rendering the error harmless.

The court's failure to conduct or order a screening investigation was error. Alaska Statute 47.30.700(a) states clearly: "Upon petition of any adult, a judge shall immediately conduct a screening investigation . . . of the person alleged to be mentally ill . . . ." Because the direction to conduct a screening investigation follows the receipt of a petition by the court, an interview conducted before the petition was filed cannot satisfy this statutory requirement.

The State argues that this statutory requirement was not clear when the hearing was held, and became clear only after our decision in *In re Hospitalization of Paige M.*, in which we held that the "screening investigation must include post-petition interviews with the [petitioner], . . . significant witnesses, and if reasonably possible, the respondent."[14] We disagree; the statutory language has remained unchanged since its enactment in 1981.[15] And even if the language were unclear, we previously found error in *In re Hospitalization of Heather R.* when the superior court failed to conduct, or even attempt, a post-petition interview with the respondent.[16] It was error to fail to conduct or order a mental health professional to conduct an investigation after the filing of the petition to hospitalize Rabi for evaluation.

But the failure to conduct a screening investigation was harmless because, as explained below, the involuntary commitment hearing and findings were free of

---

[14]     433 P.3d 1182, 1188 (Alaska 2018).

[15]     *See* ch. 84, § 1, SLA 1981.

[16]     366 P.3d 530, 533-34 (Alaska 2016).

prejudicial error, and the findings were based on a higher burden of proof, curing any procedural defects.[17] Although it was error to fail to conduct a screening interview, the error was harmless because it did not prejudice Rabi.[18]

**B.**     **Any Consideration Of Facts Not In The Record Was Harmless Error.**

Rabi argues that he "was not afforded notice or an opportunity to respond to . . . untested assertions cited by the court" in its commitment order. He alleges that the court relied on facts not in evidence and that the commitment order must therefore be vacated. Rabi identifies five instances where the court relied on allegations in the evaluation and commitment petitions that were not part of the record at the commitment hearing. He argues that four of the allegations were made only in the commitment petition: that (1) he was "covered in feces and vomit, experiencing diarrhea . . . , and unable to hold food down"; (2) he was "disheveled, odoriferous, and minimally verbal"; (3) he "reported being able to cure his schizophrenia through fasting and prayer"; and (4) he "refused to shower, initially stating that he was unable to open his hands, but stated to be [sic] healthy enough for discharge and would shower when he got back to his hotel room." Rabi also argues that the allegation that he had spent "approximately 49 of the past 57 days hospitalized" was made only in the evaluation petition. Because neither of the petitions in which these allegations were made was entered into evidence,

---

[17]     *See In re Meredith B.*, 462 P.3d at 529; *see also Amy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 440 P.3d 273, 279 (Alaska 2019) ("[W]e must disregard harmless errors that have no substantial effect on the rights of parties or on the outcome of the case." (quoting *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016))).

[18]     We emphasize that although the error was harmless in this case, AS 47.30.700 requires courts to direct or perform a screening interview before ordering a respondent hospitalized for evaluation.

Rabi argues that relying on the contents of the petitions violated the rules of evidence and prejudiced him.

The State concedes that the number of days that Rabi had spent in the hospital was only listed in the petition for evaluation. But it asserts that each of the other allegations was established through witness testimony at the commitment hearing. And it argues that the properly admitted evidence in the record is sufficient to support the superior court's commitment order, and that any error in relying on the precise number of days that Rabi had been previously hospitalized is harmless.

"To become evidence, that is, part of the collective mass of things for a tribunal's consideration, the information must be proffered and admitted as required by the rules of the tribunal."[19] The rules of evidence and civil procedure apply to a commitment hearing, with the caveat that they be utilized "to provide for the informal but efficient presentation of evidence."[20] Neither the evaluation nor the commitment petition was admitted as evidence at the commitment hearing. It was therefore error if the superior court relied upon allegations that were contained only in these petitions.[21]

But the State is correct that most of the allegations Rabi identifies were supported by specific testimony from the psychiatrist who testified, without objection, as an expert witness. In his expert testimony in the commitment hearing, the psychiatrist

---

[19] *Diego K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 411 P.3d 622, 628 (Alaska 2018).

[20] AS 47.30.735(b)(4).

[21] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1105 (Alaska 2011) (concluding reliance on evidence "not before the court at trial" was error); *see In re Hospitalization of Randy N.*, No. S-16535, 2019 WL 1503009, at *6 (Alaska Apr. 3, 2019) (stating that a court may not independently rely on screening investigation report referred to by expert).

described Rabi's soiled and unkempt condition when he arrived at the hospital, his refusal to shower at API, his failure to use toilet facilities as shown by his feces-soiled clothing, his failure to recognize the seriousness of his mental illness, and his refusal to eat. He testified that he based his opinion on Rabi's medical history as noted in API records. Because he testified as an expert, the psychiatrist was entitled to rely on "facts or data . . . not . . . admissible in evidence" as long as they were "of a type reasonably relied upon by experts in [his] particular field," and "disclose . . . the underlying facts or data" supporting his opinion.[22] It was not error for the court to rely on the expert testimony based on such information.[23]

Other testimony supports the court's finding that Rabi mistakenly believed he had been cured despite stopping his medication. The court visitor testified that Rabi believed he was cured, and Rabi himself testified that he did not need treatment, even though he stopped taking his medication when he arrived in Alaska.

The remaining allegations, however, were not supported by testimony. The allegations that Rabi was "minimally verbal" and unable to keep food down were made only in the commitment petition. And the allegation that he had been hospitalized for "49 of the past 57 days" appeared only in the petition for evaluation.

Relying on allegations made only in petitions that were not admitted as evidence was error.[24] The record before us does not make clear to what extent the

---

[22]     *See* Alaska R. Evid. 703; Alaska R. Evid. 705; *see also Pingree v. Cossette*, 424 P.3d 371, 378 (Alaska 2018) ("[E]xpert[s] . . . do not have to rely only on admissible evidence in forming their opinion, and evidence they rely on may be disclosed during [their] testimony."); *In re Randy N.*, 2019 WL 1503009, at *6.

[23]     *See In re Randy N.*, 2019 WL 1503009, at *6.

[24]     *Christina J.*, 254 P.3d at 1105; *see also In re Randy N.*, 2019 WL 1503009,
(continued...)

superior court relied upon the unsupported allegations that Rabi was "minimally verbal," unable to keep food down, and had been hospitalized for "49 of the past 57 days." But because it was error to rely upon them at all, we must determine whether the error was prejudicial. In making our determination we "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties" and act only when the result is otherwise "inconsistent with substantial justice."[25]

Any error here was harmless. Rabi was able to elicit testimony from the psychiatrist disproving the allegations in the petition that he was not eating and minimally verbal, and the court's legal analysis makes no reference to either allegation. The court's consideration of the allegations, even assuming it did so, does not appear to have prejudiced him. Further, Rabi's testimony that he had moved to Alaska only four months prior to the hearing, and the psychiatrist's testimony that Rabi had been hospitalized four times in recent history, make harmless any reliance on the allegation that Rabi had been hospitalized for "49 of the past 57 days." In addition, other evidence in the record provides ample support for the court's conclusion that Rabi was gravely disabled without consideration of these allegations. Although it was error to rely to any extent upon the three allegations contained only in the evaluation and commitment petitions, the error was harmless.

## C. The Superior Court Did Not Err By Finding Clear And Convincing Evidence That Rabi Was Gravely Disabled.

Before a superior court can order a person involuntarily committed for mental health treatment, the court must find by clear and convincing evidence "that the respondent is mentally ill and as a result is likely to cause harm to the respondent or

---

[24]    (...continued)
at *6.

[25]    Alaska R. Civ. P. 61.

others or is gravely disabled."[26] API's petition to commit Rabi alleged that he was gravely disabled, and the court agreed, finding that he was gravely disabled under AS 47.30.915(9)(B).

A person is gravely disabled when the person "will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the respondent's previous ability to function independently."[27] We have clarified that to satisfy the statutory requirement a petitioner must prove that the respondent is incapacitated by mental illness and unable "to live safely outside of a controlled environment."[28]

Rabi argues there was insufficient evidence that he was gravely disabled. He claims that his "failure to adhere to accepted bathing practices" was a social eccentricity and "within a range of conduct that is generally acceptable," rather than evidence of a "disabling level of distress," that "the evidence linking Rabi's hand position to a risk of catatonia was too uncertain to justify commitment," and that the court's conclusion that his belief that he was healthy and ready for discharge was unreasonable was only a "disagreement [that] did not suggest that he was severely

---

[26] AS 47.30.735(c).

[27] AS 47.30.915(9)(B). A person may also be found to be gravely disabled when they are "in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken." AS 47.30.915(9)(A).

[28] *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 87 (Alaska 2012) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 378 (Alaska 2007), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019)).

distressed and thus suffering a significant impairment in his ability to function independently."

The psychiatrist's and Rabi's testimony provided sufficient evidence to satisfy the clear and convincing standard of proof without consideration of the allegations contained only in the petitions. Information to which witnesses testified, without objection, is evidence.[29] The superior court had evidence before it that confirmed allegations in the petition and provided clear and convincing evidence to support its conclusion that Rabi was gravely disabled. It was not error to rely upon this evidence.[30]

The evidence presented at the commitment hearing provided clear and convincing evidence that Rabi was mentally ill and suffering from schizophrenia. The psychiatrist testified that Rabi's condition was extreme; upon arrival to Providence, Rabi's clothes were covered in feces and vomit and he was not keeping himself dry, attending to his toileting needs, or showering. He did not recognize that his physical condition would subject him to social alienation and lead to isolation. He did not have insight into his mental illness while at API or during the commitment hearing. This is

---

[29]     *Bennett v. Weimar*, 975 P.2d 691, 696 (Alaska 1999) (citing *Murat v. F/V Shelikof Strait*, 793 P.2d 69, 75 (Alaska 1990)) (recognizing a superior court may properly consider evidence that had not been timely objected to).

[30]     *See, e.g., Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1254 (Alaska 2010) (concluding reliance on expert testimony not error when expert opinion based on review of records of type reasonably relied upon by experts in field); *see also In re Hospitalization of Randy N.*, No. S-16535, 2019 WL 1503009, at *6 (Alaska Apr. 3, 2019).

sufficient to show that Rabi was severely distressed and suffering significant impairment in his ability to function independently, and that his illness resulted in grave disability.[31]

Each of Rabi's arguments depends upon the superior court's adopting his testimony over the psychiatrist's. But the court determined that the psychiatrist was more credible than Rabi, and its decision was supported by Rabi's own testimony and behavior at the hearing. "We grant 'especially great deference' when the 'findings require weighing the credibility of witnesses and conflicting oral testimony.' "[32]

The court found that Rabi's refusal to shower was not an eccentricity, but rather an indication of his mental illness. Rabi believed that he had been fine prior to his hospitalization, and would continue to be fine if released back to a hotel. But the superior court accepted the psychiatrist's testimony that Rabi's belief was unreasonable; Rabi had not been taking care of his needs outside the hospital. The court found that Rabi's failure to recognize that he was not showering as he believed he was, and his failure to acknowledge that he was covered in vomit and feces upon his arrival to Providence, stemmed from his underlying mental condition. Contrary to Rabi's argument that his refusal to shower and his hygienic issues were mere social eccentricities, the record shows that they are symptoms of his mental illness. His inability to understand that he was "not fine" prevented him from taking care of himself.

Rabi's claim that the court erred by finding him gravely disabled based on his lack of hygiene because he appeared "clean" and "presented well" at the hearing is

---

[31] *See, e.g.*, *In re Hospitalization of Mark V.*, 375 P.3d 51, 60 (Alaska 2016) (affirming a 30-day commitment where the respondent's "mental illness and resulting behavior . . . impair[ed] his judgment and reasoning to the point where he [was] entirely unable to fend for himself independently in the community"), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[32] *In re Hospitalization of Danielle B.*, 453 P.3d 200, 202-03 (Alaska 2019) (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

also unpersuasive. The standing master specifically commented on Rabi's appearance and factored it into the recommendation for commitment. But Rabi's appearance at the hearing did not require the court to disregard or reweigh other evidence that he was gravely disabled. And while a court must determine whether a respondent is gravely disabled at the time of the hearing, it must also take into account recent behavior and the potential for future suffering.[33] Because Rabi's lack of insight into and lack of treatment for his illness had caused the condition that he was in when he arrived at the emergency room, the evidence demonstrated that he would have again deteriorated if not treated.

We are also not persuaded by Rabi's argument that his hand condition is not proof that he was gravely disabled. The superior court did not base its finding solely on the fact that Rabi's hands were held in an unnatural position at the hearing, but rather found that this symptom supported the psychiatrist's concerns about possible catatonia. The evidence showed that Rabi's physical problems had previously resulted in his being found catatonic in the road and prevented him from showering and taking care of his hygiene. Thus, even if, as he argues, it was a "stretch" to believe that full-blown catatonia would have resulted from his hand condition, there was sufficient evidence in the record that Rabi was gravely disabled. His schizophrenia caused his hand immobility, and his hand immobility seems to have prevented him from adequately tending to his hygienic needs.

Finally, Rabi's claim that he simply disagreed with the psychiatrist about whether he was healthy enough to leave the hospital does not detract from the evidence that he was gravely disabled or indicate that the superior court clearly erred. We do not

---

[33] *See In re Jeffrey E.*, 281 P.3d at 87-88 (holding that AS 47.30.915(9)(B) is "forward-looking").

"reweigh evidence if the record supports the court's finding,"[34] and we defer to the superior court when findings require weighing witness credibility and conflicting oral testimony.[35] The superior court found that Rabi's failure to acknowledge that he was covered in vomit and feces, understand that such a physical condition was a problem, or understand that his condition would lead to further deterioration and isolation was evidence of his grave disability. The testimony Rabi offers to support his position is insufficient to rebut this finding. The record does not merely suggest that Rabi objected to being held in the hospital, but rather that Rabi did not believe he needed to be in the hospital because he was not suffering from any mental illness. The court did not err by finding clear and convincing evidence that Rabi was mentally ill, and that his mental illness caused him to be gravely disabled.

**D. The Superior Court Did Not Err By Finding Clear And Convincing Evidence That There Was No Less Restrictive Alternative To Commitment**.

Among the findings a superior court must make before ordering involuntary commitment is that the petitioner has proved by clear and convincing evidence that there are no less restrictive alternatives available to treat the respondent.[36] "A 'least restrictive alternative' is 'no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient' and does not restrict an individual except as reasonably necessary to provide treatment and protect the patient and others from

---

[34] *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1264 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 766 (Alaska 2016)).

[35] *In re Danielle B.*, 453 P.3d at 202-03.

[36] *Id.* at 203.

physical injury."[37]  A person may be committed "only if no feasible less restrictive alternative treatment is available."[38]

Rabi argues that because the superior court failed to consider the possibility of outpatient treatment at Anchorage Community Mental Health Services (ACMHS), the State did not prove that there were no less restrictive alternatives to commitment.  He points to his testimony that he would be willing to pursue treatment at ACMHS as well as the lack of any evidence that he was not eligible for treatment there and argues the court erred by not considering it as a less restrictive alternative to API.

The State responds that the superior court rejected this option when it stated that Rabi's "overall condition" required inpatient treatment and medication.  It argues that because Rabi had stopped taking his prescribed medication and believed that he was not mentally ill and did not require treatment, the superior court was entitled to rely on that evidence to find that hospitalization was the only alternative that would provide Rabi adequate treatment and protection from harm.  The State notes that even though Rabi testified during the commitment hearing that he would seek outpatient treatment, this was unlikely given the fact that Rabi did not believe that he needed treatment for his schizophrenia.

In its order the superior court discussed possible alternatives to commitment only briefly.  The court relied on the psychiatrist's testimony that Rabi's "overall condition" required him to be involuntarily committed for treatment.  The psychiatrist testified that Rabi had no insight into his illness and that his belief that he was taking care of his needs before he was hospitalized was akin to a "negative hallucination."  Rabi

---

[37]     *Id.* (quoting AS 47.30.915(11)).

[38]     *Id.* (quoting *In re Hospitalization of Naomi B.*, 435 P.3d 918, 932 (Alaska 2019)).

repeatedly claimed he was healthy and ready to leave the hospital because he had been successfully caring for himself before he arrived at the emergency room. But in reality he had not been, as was apparent from his condition when he arrived. The psychiatrist also testified that Rabi had taken medication in the past but deteriorated after he stopped. And based on Rabi's previous hospitalizations, the psychiatrist believed that Rabi would improve if he were committed for treatment and would regain his ability to "make an informed decision about how he chooses to live."

The evidence presented to the court demonstrated that Rabi had been unable to care for himself outside an institution and had refused to take the medication needed to allow him to function independently. Given this evidence, combined with Rabi's lack of insight into his illness, the superior court did not err by finding clear and convincing evidence that there was no less restrictive alternative to commitment.

### E. The Superior Court Did Not Err By Granting The Involuntary Medication Petition.

A court may order involuntary administration of psychotropic medication to a patient who lacks capacity to give or withhold informed consent in a non-crisis situation only if it finds clear and convincing evidence that involuntary medication is in the patient's best interests in light of any available less intrusive treatments.[39] Because involuntary medication infringes upon a patient's constitutional rights to liberty and privacy,[40] the State must demonstrate by clear and convincing evidence that no less intrusive alternative is available.[41]

---

[39] *In re Naomi B.*, 435 P.3d at 934 (citing *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 179-80 (Alaska 2009)).

[40] *Id.* at 929.

[41] *Id.* at 935 (quoting *Bigley*, 208 P.3d at 180).

In making this determination we require the superior court to consider five factors (the *Myers* factors).[42]  As codified in AS 47.30.837(d)(2), those factors are:

> (A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
>
> (C) a review of the patient's history, including medication history and previous side effects from medication;
>
> (D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and
>
> (E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment . . . .

Rabi appears to argue that the court did not sufficiently consider the fifth *Myers* factor:  "alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment."[43]  He argues that the superior court did not have clear and convincing evidence that there was no less intrusive alternative to involuntary medication because it did not consider whether Rabi's previous medication was a reasonable alternative; whether a different medication that had been offered to him during his hospitalization was a better alternative; or whether ordering his commitment without medication was a reasonable alternative.

---

[42]  *Bigley*, 208 P.3d at 180 (citing *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 252 (Alaska 2006)).

[43]  *Id.* (alteration in original) (quoting *Myers*, 138 P.3d at 252).

To support his arguments, Rabi notes his testimony concerning the medication he had previously taken and the psychiatrist's failure to discuss it as a possible alternative. Rabi also points to the psychiatrist's testimony that he spoke to Rabi about taking yet another medication, aripiprazole, while in the hospital to show that the court should have been provided more information on that drug's risks and benefits. And, finally, Rabi argues that it was error not to discuss the possibility of treatment without medication as an alternative.

The State responds that because Rabi testified he suffered debilitating side effects while on his previously prescribed medication, there was no need for the superior court to consider the medication as a potential option. It also argues that there was no need for the court to consider orally administered aripiprazole based on the psychiatrist's testimony that it was less reliable than the medications proposed in the petition. The State further argues that courts are not required to consider nontreatment as an option, but must only consider the risks to the respondent if no treatment is provided.

The superior court's order discussed the first four *Myers* factors, and the record contains testimony from the medication hearing discussing the *Myers* factors. The court noted the psychiatrist's testimony about Rabi's diagnosis and prognosis and the proposed medications, including their dosages, side effects, and benefits. It also cited to the psychiatrist's expert opinion that the benefits of the two proposed medications would outweigh the risk of any side effects, but that it was impossible to predict whether Rabi would experience side effects until he took the medication. And the psychiatrist testified about the potential dangers of combining the proposed medications with other drugs.

The court also relied on testimony about Rabi's medical history from Rabi, the psychiatrist, and the court visitor. Rabi described severe side effects from his previous medication, and the court visitor reported that Rabi had told her the same. The

psychiatrist testified that although API had prescribed Risperdal and olanzapine for Rabi previously, he did not know whether Rabi had actually taken them, or whether Rabi had experienced allergic reactions or other side effects.

We are not persuaded by Rabi's argument that the psychiatrist should have discussed the possibility of prescribing the drug that he had formerly been prescribed. Rabi himself testified, and the court visitor testified that Rabi told her, the drug caused him debilitating side effects. Based on that testimony, as well as his own professional judgment, the psychiatrist was not required to discuss the apparently harmful drug as a treatment option.

Neither was the psychiatrist required to elaborate on the potential side effects of aripiprazole. In his opinion, aripiprazole was less effective and less reliable than Risperdal, and was not available in a short-acting injectable form. Because the psychiatrist testified that the combination of drugs listed in the petition was the best available option to treat Rabi's symptoms, the State was not required to present more information concerning a less suitable drug's side effects.

Rabi's final argument, that the superior court clearly erred by failing to explore the possibility of treatment without medication, also lacks merit. The *Myers* factors require a court to address the impact of administering medication and whether medication is in the respondent's best interests.[44] Before reaching its consideration of these factors, a court must have already determined that the respondent must be involuntarily committed to a treatment facility.[45] It is only after such a decision has been made based upon evidence related to the person's mental health and medical history that

---

[44] *Myers*, 138 P.3d at 252.

[45] *See id.* at 242-43 (noting that filing a petition for medication is the "second step of the process").

any consideration is given to requiring medication in addition to other treatment at the facility.[46] By the time a court turns to the *Myers* factors to determine whether the specifically proposed medication regime is appropriate and necessary, it has already made a series of conclusions relating to needed treatment. The consideration of "alternative treatments" under the fifth *Myers* factor then narrows the focus to whether the particular proposed medication poses less of a risk than nontreatment without it.[47] Rabi's treating psychiatrist testified that Rabi was spiraling into an isolated existence, "cut off from social contact or ostracized by other people" due to his "belief that he was totally well." The court appears to have considered the option of nontreatment and concluded that the administration of medication better served Rabi's best interests.

Rabi's arguments do not show that the superior court clearly erred in approving the administration of medication. The record shows that the administration of Risperdal and olanzapine was in Rabi's best interests and that there were no less intrusive alternative treatments.

## V. CONCLUSION

We AFFIRM the evaluation, commitment, and medication orders.

---

[46] *See id.*

[47] *See id.* at 252.