*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court No. S-16524 |
| DARREN M. | ) Superior Court No. 3AN-16-02059 PR ) ) O P I N I O N ) ) No. 7298 – September 14, 2018 ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Laurence Blakely, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Darren M. Kathryn R. Vogel, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee State of Alaska.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

STOWERS, Chief Justice.

## I.    INTRODUCTION

After an involuntary commitment trial, the superior court issued an order committing the respondent to the Alaska Psychiatric Institute (API) for 90 days. The respondent appeals, arguing that the jury was incorrectly instructed on the unanimity requirement relating to a finding of grave disability. He also argues that the court erred in finding there was sufficient evidence that his condition would improve with treatment

to support an involuntary commitment order.  On the second issue, his appeal raises questions regarding the applicable legal standard.  We conclude that any error in the jury instructions was invited error, that the superior court applied the correct legal standard regarding respondent's chance of improvement, and that the court's finding on that issue is supported by the record and not clearly erroneous.  We affirm the superior court's commitment order.

## II.     FACTS AND PROCEEDINGS

In August 2016, after Darren M.[1] removed the screen from the window of his third-floor apartment, he told his niece that he intended to jump.  The niece called an ambulance, which transported Darren to the psychiatric emergency department at Providence Alaska Medical Center (Providence).  Later that same day, a counselor at Providence filed a petition for an order authorizing Darren's hospitalization for evaluation based on her determination that Darren, who had previously been diagnosed with bipolar disorder, was gravely disabled and a danger to himself or others.  The petition alleged that Darren presented "with loose associations, actively talking to himself, appearing psychotic" and that he was not taking his medications.

The superior court granted the petition and ordered Darren to be admitted to API for a mental health evaluation to be completed within 72 hours.  The State, representing API, subsequently filed a petition seeking to have Darren committed to API for 30 days.  After a hearing on Darren's mental condition, the court granted the petition on the basis that Darren was mentally ill and likely to cause harm to himself or others.[2]  Near the end of the 30-day commitment period, the State filed another petition seeking

---

[1]     We use a pseudonym for "Darren" to protect his privacy.

[2]     Darren has not appealed either the order authorizing hospitalization for evaluation or the 30-day commitment order.

to extend Darren's commitment for an additional 90 days. The petition alleged that Darren was mentally ill, that as a result he was both gravely disabled and likely to cause harm to himself or others,[3] that there was reason to believe his mental condition could be improved with treatment,[4] and that there was no less restrictive treatment alternative available. Before trial, the State withdrew the allegation that Darren presented a risk to himself or others, proceeding solely on a theory of grave disability. A bifurcated trial was held in October 2016: a six-person jury[5] considered whether Darren was mentally ill and as a result gravely disabled, and a subsequent bench hearing was held on whether a less restrictive treatment alternative was available and whether there was reason to believe Darren's mental condition could improve with treatment.

## A.    Testimony Before The Jury

At the jury portion of the trial, Darren's niece, daughter, and son all testified about Darren's mental condition, living situation, and recent behavior. The jury also heard testimony by Gerald Martone, a psychiatric nurse practitioner and Darren's primary care provider at API. The court recognized Martone as an expert witness.

Darren's daughter testified that Darren has a history of mental illness going

---

[3]    Under AS 47.30.730(a)(1), a petition for a 30-day commitment must allege that the respondent, as a result of mental illness, is gravely disabled or likely to cause harm to himself or others. The allegation requirements for 30-day commitment petitions are incorporated by reference in the statutes regarding petitions for 90-day and 180-day commitment orders. *See* AS 47.30.740(a); AS 47.30.770(a). The court may commit a respondent on any one or more of those grounds. *See* AS 47.30.735(c); AS 47.30.755(a); AS 47.30.770(b)-(c).

[4]    Under AS 47.30.730(a)(3), a commitment petition based on a theory of grave disability must allege "that there is reason to believe that the respondent's mental condition could be improved by the course of treatment sought."

[5]    *See* AS 47.30.745(c).

back to the 1980s when he was diagnosed with bipolar disorder. Darren lived with her in Oregon from approximately October 2015 until April 2016; in that time she observed that Darren struggled "with bouts of mania and depression"; suffered from paranoia, delusions, "racing thoughts," and insomnia; and was "not able to hold a conversation."

In the spring of 2016, Darren moved to Alaska and lived with his niece while she helped him find senior housing. After Darren transitioned to independent living in senior housing, it appears his condition declined further: his niece, daughter, and son all expressed concern about Darren's ability to care for his own needs. The niece testified that Darren would become forgetful when cooking and that he confused his current address with one for a home where he had not lived in 15 years. Darren's daughter testified that his apartment was "a little messy" and that she found clothing soiled with feces in the bathroom garbage that "smelled like it had been there for a little while." His son testified that Darren stopped buying groceries when he had previously gone shopping almost daily, that he "wasn't eating very well," and that he started drinking "much more than he . . . ever normally would," to the point of scaring other residents of his apartment complex, as well as falling down and breaking his collar bone.

Their testimony was particularly concerned with Darren's ability to care for his medical needs. The daughter testified that in August 2016, Darren told her "[h]e hadn't been taking his medications since spring." She testified that Darren "did not understand that you have to make appointments" to see a doctor. On one occasion, Darren had told her that he had walked into a doctor's office concerned that "his mouth was cancerous" and demanded a biopsy; because he did not have an appointment, "he just left and didn't get screened at all and didn't make . . . an appointment for the future." The niece testified that Darren believed "doing arm exercises and push ups to help strengthen him" would help heal his fractured collar bone. The niece testified that she

had discovered an empty bottle of heart medication in Darren's apartment; this concerned her because she had previously seen the bottle full with enough pills in the bottle to "last quite a while." Her testimony also indicated that she was not sure her uncle knew what the medication was: Darren told her it was not actually his medication but that he had found it on the bus and taken pills from it anyway. The niece also testified that she once found Darren with "very swollen" legs that he "didn't seem concerned about" and a black eye that he was seemingly unaware of and could not explain.

Darren's niece testified in detail about the events of August 19, 2016, the day she called the ambulance. Earlier, either that morning or the day before, Darren had pulled the communal fire alarms in his buildings, apparently out of concern that they were not working. The niece later found Darren with his coat on inside his apartment with the window open and the screen removed. When she asked why his windows were open, Darren responded that "the fire alarms weren't working and that he had to jump" but that he first needed to buy a candle from the store. Concerned that Darren might actually jump from the third-floor window, the niece called for an ambulance to take Darren to Providence. While the two waited for the ambulance, Darren told his niece that a nearby streetlight would turn on if tapped three times with a lighter or rock and indicated an interest in rewiring the light "to make it stay on."

Darren's son and daughter testified about his condition during his initial 30-day commitment. When his daughter visited him, Darren insisted they sit at the children's table so that he could see out the front door and "see who was coming in and going out," expressed concerns about keeping her safe, and wanted the police to be present during her visit. She noticed various cuts, scrapes, and bruises on her father, as well as swollen ankles, and she worried he was not taking care of his congestive heart

failure.  Darren did not take his medications consistently, and he told his daughter that taking his medications would "make him visible" and prevent him from protecting her and her brother.  Darren told her that he wanted "to get a handgun as soon as he gets out of API" and told his niece that "he wanted to get a gun because he didn't want his son to know where he lived."  According to his son, Darren likened himself to Jack Ruby[6] and believed he "would be fit to be . . . [a] contract killer."  The son testified that Darren suffered from delusions, describing demons and "religious, spiritual things" that others could not see.  The son also noticed a cut on Darren's leg that Darren said he sustained when "the floor came up and cut him," referencing the "T-1000," a shape-shifting android assassin featured in the movie *Terminator 2*.

Martone testified that in addition to bipolar illness, Darren suffers from Korsakoff syndrome, which is a form of permanent, irreversible nerve damage caused by vitamin B1 deficiency, and which is most commonly a result of chronic alcoholism. He testified that Korsakoff syndrome causes brain function to deteriorate, resulting in confusion, eye-twitching, and a tendency to "confabulate" — inventing information to fill in for knowledge deficits — all of which were symptoms he saw in Darren.  Bipolar illness, by contrast, is a mood disorder that involves "cycling between extremes of moods, both highs and lows."  Martone testified that while "people with bipolar in a manic state have poor judgment and decision making," bipolar illness would not cause the confusion Darren was exhibiting.

Regarding Darren's ability to function outside a controlled environment,

---

**6**      Jack Ruby was the Dallas, Texas nightclub owner who fatally shot Lee Harvey Oswald while Oswald was in police custody charged with assassinating President John F. Kennedy.  Amy Tikkanen*, Jack Ruby*, ENCYC. BRITANNICA (Jan. 18, 2018), https://www.britannica.com/biography/Jack-Ruby.

Martone testified that Darren's "reality decision making [was] impaired," that Darren "[did] not know the consequences of his action[s]," that "he [did] not have insight into his illness," and that he was unable to communicate coherently. Martone explained that a "KELS test" — an "evaluation of living skills" — was given to Darren at API, and the test indicated that Darren "would need assistance to perform his activities of daily living independently." Martone also testified that Darren would not "be safe in the community if he were to be released [at the time of trial]" because "his judgment [was] very impaired," he "ha[d] trouble forming new memories," and he would "get[] easily angered and irritated." By contrast, Martone testified that API would be a "very safe place" for Darren. Finally, Martone corroborated the daughter's testimony that Darren did not always take his medication, against Martone's advice.

Darren did not testify and did not call any witnesses on his behalf.

## B. The Jury Instructions And The Jury's Findings

After the close of evidence, the superior court instructed the jury on the findings it was required to make. Instruction 12 told the jury: "[Darren] should be involuntarily committed for treatment at Alaska Psychiatric Institute only if you find that the [S]tate has proved by clear and convincing evidence that [he] is mentally ill and as a result is gravely disabled." Instruction 14 defined the term "gravely disabled":

> Gravely disabled means a condition in which a person, as a result of mental illness:
>
> (1) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter or personal safety as to render serious accident, illness or death highly probable if care by another is not taken; or
>
> (2) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional or physical distress,

and this distress is associated with significant impairment of judgment, reason or

behavior causing a substantial deterioration of the person's previous ability to function independently. This distress refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment.[7]

Instruction 22 informed the jury about the unanimity requirement:

> To reach a verdict in this case, five of you must be in agreement as to each answer you give on the special verdict form. The same five jurors need not agree as to every answer, as long as any combination of five jurors agrees to each answer on the special verdict form.

The special verdict form given to the jury asked two questions: whether the State had proved by clear and convincing evidence that Darren was mentally ill, and whether the State had proved by the same standard that Darren was gravely disabled as a result.

While Darren's attorney made some pre-trial objections to the State's proposed grave disability instruction, the instructions used by the court on the issues of grave disability and jury unanimity, as well as the special verdict form, were all either identical or nearly identical to the instructions and verdict form Darren's attorney had proposed. At trial, neither party made further objections regarding the substance of either the jury instructions or the verdict form.[8]

The jury returned a verdict finding that the State had proved by clear and convincing evidence that Darren was both mentally ill and as a result gravely disabled.

---

[7] Apart from the final sentence of subdivision (2), this definition mirrors verbatim the statutory definition of "gravely disabled" provided in AS 47.30.915(9). The final sentence reflects our decision in *Wetherhorn v. Alaska Psychiatric Institute*, in which we held that the second part of the statutory definition was constitutional only "if construed to require a level of incapacity so substantial that the respondent is incapable of surviving safely in freedom." 156 P.3d 371, 384 (Alaska 2007).

[8] The parties did ask for a correction to a clerical error in the jury unanimity instruction, which the court granted.

## C.    Post-Trial Hearing And Court Order

The day after the jury verdict, the court held an evidentiary hearing on the two remaining issues: whether there was reason to believe Darren's mental condition could be improved by treatment and whether involuntary commitment at API was the least restrictive treatment alternative. The State again called Martone as an expert witness. Darren did not testify or call any witnesses.

Martone's testimony was primarily focused on the issue of improving Darren's condition. In his testimony before the jury, Martone had testified that Korsakoff syndrome is a "permanent, irreversible" condition and that Darren's bipolar illness is a "lifelong diagnosis." At the bench hearing, Martone nonetheless testified that with treatment, Darren's Korsakoff symptoms had already "improved slightly" and that he would "expect a slight more improvement." Specifically, Martone testified that daily doses of vitamin B1 had caused a slight improvement in Darren's eye twitching and that further improvement, including to Darren's "thinking or perceptions," could be possible. He testified that "in 25 percent of cases, you can have a slight improvement if you're consistently getting vitamin B1 every day," although he could not say whether Darren would be in that group. Martone testified that some of Darren's other symptoms — specifically, his agitation, frustration, delusions, and paranoia — as well as his bipolar illness, could be treated with the antipsychotic drug Haldol (a brand name for haloperidol), though they would likely not be completely relieved. Martone also testified that Darren was already showing signs of improvement from treatment with Haldol. With respect to Darren's confusion, however, Martone testified that it was a result of Korsakoff syndrome and therefore he would "only expect . . . a slight improvement."

On the issue of less restrictive treatment alternatives, Martone testified that Darren was not "showing insight into his mental illness," that Darren had refused to

discuss the idea of working with an outpatient provider, and that Darren was "too agitated and disorganized" to work with an outpatient provider if he were ordered to do so. However, Martone believed it would be possible for Darren to improve to such an extent that he might at some point be able to work with an outpatient provider. On cross-examination, Martone repeated many of the same points, and testified that API's goal was not to keep Darren long term but to "hold him and try to treat him until [they could] find a suitable place for him . . . to live . . . with a little more freedom[]."

In closing, the State asked the court to find "that there's reason to believe that the respondent's mental condition could be improved by treatment" and "that commitment is the least-restrictive alternative." Darren argued that the State had not met its burden to prove either of these requirements by clear and convincing evidence. Specifically, Darren argued the State's showing was insufficient because, as Martone testified, Darren's Korsakoff syndrome could not be cured, and because there was only a 25 percent chance of even a slight improvement, with no indication that Darren was within those 25 percent. The State argued in rebuttal that Martone had testified to actual and expected improvement in other symptoms, such as Darren's paranoia, agitation, and delusions, and asserted that the law requires only "an improvement in the [respondent's] mental condition" viewed broadly, and that the State need show only a likelihood of improvement, not of "great improvement." Darren's attorney added as a concluding remark that she believed it to be "a very dangerous thing to think that slight improvement would qualify."

The superior court expressed frustration with the case on two points: first, API expected only "slight improvement" in Darren's condition whereas "the amount of liberty that's being taken away is great"; second, because there are no alternative facilities available in Anchorage, the only options were that "someone is locked up and

treated or they're let go in the streets and there's no treatment." Even so, the court held that the State met its burden to prove by clear and convincing evidence that "treatment could improve [Darren]" and that "there is not . . . presently a less-restrictive treatment [alternative]."

Based on the findings from the jury trial and the bench hearing, the court issued an order committing Darren to API for 90 days. Darren appeals.

## III. STANDARD OF REVIEW

"We apply our independent judgment to the interpretation of the Alaska Constitution and statutes, adopting 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[9] We review factual findings in involuntary commitment proceedings for clear error, and "we reverse only if our review of the record leaves us with a definite and firm conviction that a mistake has been made."[10]

"Invited error 'occurs when the court takes erroneous action at the express request of [a party], and then [that party] urges reversal on that basis on appeal.' "[11] When an alleged error is invited, we examine that error to see whether there is an "exceptional situation" making reversal "necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice."[12]

---

[9] *Wetherhorn*, 156 P.3d at 375 (footnotes omitted) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[10] *Id.*

[11] *Roderer v. Dash*, 233 P.3d 1101, 1114 (Alaska 2010) (alterations in original) (quoting *Barrett v. State*, 772 P.2d 559, 568 n.10 (Alaska App.1989)).

[12] *Id.* (quoting *Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1038 (Alaska 2008)).

"We apply our independent judgment in determining mootness because, as a matter of judicial policy, mootness is a question of law."[13]

## IV. ANALYSIS

Darren challenges the superior court's commitment order on two grounds. He argues that the court erred (1) in how it instructed the jury on the grave disability issue and (2) in finding that there was sufficient evidence that Darren's condition would improve with treatment. For the reasons discussed below, we affirm the commitment order.[14]

### A. Any Error In The Challenged Jury Instructions Was Invited Error.

Under AS 09.20.100, "not less than five-sixths of the jury may render a verdict, which is entitled to the legal effect of a unanimous verdict at common law." At the conclusion of the jury trial, the jury was asked on the special verdict form whether the State had shown, by clear and convincing evidence, that Darren was "gravely disabled" as a result of mental illness. The jury returned a special verdict form indicating that at least five of six jurors believed the State had done so. However, both the statutory definition of "gravely disabled"[15] and the one provided to the jury contain two

---

[13] *Long v. Arnold*, 386 P.3d 1217, 1223 n.19 (Alaska 2016) (quoting *Akpik v. State, Office of Mgmt. & Budget*, 115 P.3d 532, 534 (Alaska 2005)).

[14] The State contends that Darren's appeal is moot because the commitment order has already expired and Darren has already been released from API. However, the State suggests that this court "may wish to hear his appeal on the merits under a mootness exception" — specifically, the public interest exception. *See In re Tracy C.*, 249 P.3d 1085, 1089-90 (Alaska 2011). Darren appears to concede that his appeal is technically moot, but he argues that the public interest exception applies and that we should hear the case on its merits. We agree and will consider this appeal.

[15] AS 47.30.915(9).

subdivisions, allowing the jury to conclude that Darren was gravely disabled either because he was in danger of physical harm arising from neglect of his basic needs or because severe and abnormal distress associated with significant impairment of judgment, reason, or behavior rendered him incapable of living safely outside a controlled environment. Darren argues that it was legal error for the court not to instruct the jury that it had to agree on a specific part of the definition as the basis for its verdict.

Darren did not raise this issue before the trial court: he did not object to the court's jury instruction and did not request a jury instruction that would require the jury to agree on a specific basis for a finding of grave disability. On the contrary, the court's jury instructions defining "gravely disabled" and explaining the jury unanimity requirement, as well as the special verdict questions, are effectively identical to those Darren himself requested.

It is clearly established under Alaska law that a party cannot complain of errors in jury instructions after that party requested, approved, or advocated for the disputed instructions at trial. For example, in *Power Constructors, Inc. v. Taylor & Hintze*, we held that the plaintiff's claim of error was waived when the plaintiff expressly endorsed the instructions that were read to the jury.[16] This principle derives from Alaska Civil Rule 51(a), which provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection."

---

[16] 960 P.2d 20, 34 (Alaska 1998); *see also Aviation Assocs., Ltd. v. TEMSCO Helicopters, Inc.*, 881 P.2d 1127, 1131-32 (Alaska 1994); *Ben Lomond, Inc. v. Campbell*, 691 P.2d 1042, 1048 (Alaska 1984); *Saxton v. Harris*, 395 P.2d 71, 72-73 (Alaska 1964).

When a party on appeal urges reversal on the basis of an allegedly erroneous action taken by the court at the express request of that party, the error — if any — is invited error.[17]  "When an error is invited, an appellate court examines the error to see if there is an 'exceptional situation' where reversal is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice."[18]  The facts of this case do not come near this level.  Darren concedes that "API's case supported both theories of grave disability," and he has not articulated — beyond merely conclusory statements — how the alleged error was prejudicial.  We hold that any error in the jury instructions was invited error and that Darren waived any challenge to the instructions given to the jury on the issue of grave disability when he himself requested them.[19]

## B.     There Was No Error In The Court's Chance-Of-Improvement Finding.

Darren next argues that "the trial court erred in concluding that Darren's condition would improve with commitment and treatment."  Darren's argument is primarily a sufficiency of the evidence argument, that the evidence "does not support a finding that treatment will improve his condition."  But Darren also raises a legal argument regarding the standard of what the State must prove — must the State prove that treatment "will" improve the respondent's condition, or that treatment "could" improve respondent's condition?  We will first clarify the legal standard before

---

[17]     *See Roderer*, 233 P.3d at 1114.

[18]     *Id.* (quoting *Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1038 (Alaska 2008)).

[19]     Our statement should not be read as implying that the superior court's jury instruction was actually erroneous.  We do not reach that issue because the alleged error was invited.

addressing whether the evidence meets that standard.

### 1. The court applied the correct legal standard to the chance-of-improvement issue.

The superior court "determined by clear and convincing evidence that there is reason to believe that [Darren's] mental condition could be improved by treatment." Darren argues that the court applied the wrong standard, and that Darren could be "committed for grave disability only upon a finding that treatment *will* improve [his] condition." (Emphasis added.) The State contends that Darren mischaracterizes the applicable standard and that the evidence presented "amply satisfie[d] the statutory requirement that there be reason to believe Darren's condition could improve."

The question whether a respondent's mental condition is likely to improve with treatment derives from Alaska's involuntary commitment statutes, as revised in 1981. As expressed in AS 47.30.655(6), one of the principles underlying the revision was "that persons who are mentally ill but not dangerous to others be committed only if there is a reasonable expectation of improving their mental condition." Pursuant to that principle, a petition for involuntary commitment "must . . . allege with respect to a gravely disabled respondent that there is reason to believe that the respondent's mental condition could be improved by the course of treatment sought."[20] Curiously, the legislature did not include an explicit requirement that the State make a corresponding showing, and the commitment statutes do not mention the question of improvement with treatment again.

If read literally, the statutes require the petitioner to allege a possibility of

---

[20] AS 47.30.730(a)(3) (requiring this allegation in a petition for 30-day commitment); *see* AS 47.30.740(a) (incorporating the same requirement in the procedure for seeking a 90-day commitment); AS 47.30.770 (incorporating the same requirement for 180-day commitment petitions).

improvement but allow the court to commit the respondent without having to make any finding on that topic, as long as the court "finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others, or is gravely disabled."[21] Of course, this literal reading of the statutory requirements would run directly contrary to the underlying legislative statement of purpose "that persons who are mentally ill but not dangerous to others be committed only if there is a reasonable expectation of improving their mental condition."[22]

We have addressed this issue only once before. In *E.P. v. Alaska Psychiatric Institute* we were asked whether the State has to prove a likelihood of improvement when it seeks to commit a person who poses a danger to himself.[23] Based on the language of AS 47.30.655(6), E.P. argued that a finding of likely improvement is required in all cases where the respondent does not pose a harm to others — that is, both in cases where the respondent is gravely disabled and in cases where he is likely to cause harm to himself.[24] We concluded that the statement of purpose in AS 47.30.655(6) conflicts with the substantive statutes regarding the required allegations and that the substantive statutes control.[25] Because the substantive statutes require alleging a possibility of improvement only "with respect to a gravely disabled

---

[21]     AS 47.30.735(c) (requiring this finding for 30-day commitment orders); *see* AS 47.30.755(a) (incorporating the same for 90-day commitments); AS 47.30.770(b) (incorporating the same for 180-day commitments).

[22]     AS 47.30.655(6).

[23]     205 P.3d 1101, 1108 (Alaska 2009).

[24]     *Id.*

[25]     *Id.*

respondent," we held that "the state is not required to show a likelihood that, in the case of a mentally ill person who poses a danger to himself, treatment will improve his condition."[26]

Underlying our decision in *E.P.* was the assumption that the State *is* required to show an expectation of improvement in the case of a gravely disabled person.[27] But in that case we directly addressed only the question whether such a requirement also applies to proceedings based on a theory of self-harm, and we declined to extend the requirement to that context.[28] We now clarify that the assumption in *E.P.* was correct. It would be absurd to interpret the commitment statutes to require the State to allege a fact that has no further relevance to the subsequent proceedings. It is also clear that the State, API, and the Public Defender Agency have all been operating under the assumption that this finding is required in the grave disability context, at least since 2009 when *E.P.* was decided; we see no reason to change this, particularly since neither party has asked us to. We therefore hold that when the State seeks to commit a mentally ill person on a theory of grave disability, it must prove a reasonable expectation of improvement with treatment.

We also hold that this showing must be made by clear and convincing evidence. In *In re Stephen O.* we explained that the "clear and convincing" standard applies to all findings relevant to involuntary commitment "to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that

---

[26] *Id.*

[27] *See id.* at 1109.

[28] *Id.* at 1108-09.

-17- **7298**

inappropriate commitments will be ordered."[29] Although *In re Stephen O.* only expressly addressed the burden of proof for the findings required by statute, the same underlying policy is applicable to all required findings in involuntary commitment cases "because of the great 'importance of the liberty right involved' and the 'massive curtailment of liberty' that such commitments entail."[30]

The question, then, is to what level of certainty the State is required to show a possibility of improvement with treatment. Again, the only relevant precedent is *E.P.*, in which we assumed what we have now concluded — that a person can be committed for grave disability only upon a showing of possible improvement with treatment. However, *E.P.* does not provide a clear answer to the question of what, exactly, the State must show. In a section heading, we stated in *E.P.* that "A Person Can Be Committed for Grave Disability Only upon a Finding that Treatment *Will* Improve the Person's Condition."[31] This is the formulation Darren asks us to adopt, and it is the most strict formulation of this requirement found anywhere in *E.P.* We also used similar phrases such as "that treatment *will* lead to improvement."[32] But our opinion in *E.P.* also phrased the required showing as "reason to believe that the respondent's mental condition *could* be improved by treatment," and as "a likelihood that the respondent's condition *could*

---

[29]     314 P.3d 1185, 1193 (Alaska 2013) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 377 n.26 (Alaska 2007)).

[30]     *Id.* (quoting *Wetherhorn*, 156 P.3d at 375-77).

[31]     *E.P.*, 205 P.3d at 1108 (emphasis added). As indicated by the discussion above, this heading does not reflect the subsequent analysis and the holding of that case. In *E.P.*, we were not asked to address this question; rather, we assumed this requirement applies in grave disability cases but declined to extend it to the self-harm context.

[32]     *Id.* at 1109 (emphasis added).

be improved by treatment."[33] Our opinion did not explain whether improvement has to be definitive or merely possible — whether treatment "would" or "could" result in improvement — and did not clarify whether the State has to conclusively prove that there is a chance of improvement or merely show that there is "reason to believe" that treatment could improve the respondent's condition.

As discussed above, the commitment statutes do not explicitly require the court to make any finding on this issue; they merely require the initial petition to allege that "there is reason to believe that the respondent's mental condition could be improved by the course of treatment sought."[34] But this guidance is sufficient, as it provides a clear formulation of what the legislature intended, and we decline to deviate from this statutory language. The formulation Darren promotes is simply too strict: as Martone's testimony in this case indicates, psychiatric medicine rarely promises absolutely certain results. Requiring the State to prove that treatment definitely would improve Darren's condition would be a tall order, and one that medical science might struggle to fulfill even under ideal circumstances. We therefore hold that the State was required to prove, by clear and convincing evidence, exactly what it was required to allege: that there was reason to believe that Darren's mental condition could be improved by the course of treatment sought. The superior court applied the correct standard when deciding this issue.

> **2. The court's chance-of-improvement finding is supported by substantial evidence and was not clearly erroneous.**

Martone testified that 25% of Korsakoff patients experience a "slight improvement" with treatment but that he could not tell whether Darren would be in that 25% group. Darren argues that this is simply too speculative to satisfy the State's

---

[33] *Id.* at 1108 (emphasis added).

[34] AS 47.30.730(a)(3); *see* AS 47.30.740(a); AS 47.30.770(a).

burden; because Korsakoff syndrome is an irreversible condition, he contends the State failed to show that Darren was likely to improve with treatment.[35] However, Martone also testified that Darren had already seen slight improvement in his Korsakoff symptoms, and he explained a number of other ways in which treatment would benefit Darren, particularly in reducing Darren's symptoms of bipolar disorder, such as agitation and paranoia. Martone's testimony did not indicate that this improvement was a mere possibility, as was the case with the Korsakoff treatment; rather, Martone expected Darren's agitation to attenuate and diminish. And while Martone testified that Korsakoff syndrome was Darren's "primary diagnosis," he also testified that the main reason why Darren was unable to work with an outpatient provider — and thus why Martone believed commitment was appropriate — was Darren's agitation, disorganization, and paranoia resulting from his bipolar disorder. When asked whether, with treatment, Darren "could improve to the extent that at some point he may be able to work with an outpatient provider," Martone indicated that Darren could, answering: "That's the goal."

On this record, we conclude that there was substantial evidentiary support for the superior court's finding that there was reason to believe Darren's mental condition could be improved with treatment, and the court's finding was therefore not clearly erroneous.

## V.    CONCLUSION

We AFFIRM the superior court's commitment order.

---

[35]    Darren's brief interprets Martone's testimony as concluding that Darren suffers *only* from Korsakoff syndrome, and not also from bipolar disorder. Darren is clearly mistaken. Martone consistently testified that Darren suffers from both conditions and that while Darren's confusion is attributable to Korsakoff syndrome, several other of his mental symptoms are attributable to bipolar disorder.