NOTICE
*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>B.G. | ) Supreme Court No. S-17924<br>)<br>) Superior Court No. 3AN-20-02055 PR<br>)<br>) MEMORANDUM OPINION<br>) AND JUDGMENT[*]<br>)<br>) No. 1873 – January 26, 2022<br>)<br>) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for B.G. Rebecca E. Hattan, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.    INTRODUCTION

A man was involuntarily committed for mental health treatment. He appeals the commitment order, contending that the superior court erred by determining that there was a reasonable expectation his condition could improve and that commitment was the least restrictive treatment available. Because we conclude that the superior court

---

[*]    Entered under Alaska Appellate Rule 214.

did not clearly err in finding reason to believe the man's condition could be improved through commitment, and because we agree with the superior court's conclusion that no less restrictive alternative to commitment would meet the man's treatment needs in this context, we affirm the superior court's decision.

## II.  FACTS AND PROCEEDINGS

B.G.[1] was initially transported to Alaska Psychiatric Institute (API) after an outpatient treatment provider petitioned for a court order authorizing hospitalization for evaluation.  According to the petition B.G. had stopped taking his medications and his mental health condition had worsened, causing him to become aggressive and preventing him from communicating his needs to others or addressing his needs himself.  Soon after B.G. was evaluated API staff petitioned the superior court for a 30-day commitment order.

At a commitment hearing before a standing master, B.G.'s treating psychiatrist, Dr. Joseph Pace, testified as the State's sole witness.  The master qualified Dr. Pace as an expert in psychiatry without objection.  Dr. Pace testified that he had evaluated B.G. and reviewed API records from B.G.'s prior admissions to the extent he felt was necessary.

B.G. interjected remarks throughout Dr. Pace's testimony.  Some remarks were responsive to the proceedings, such as B.G. expressing his desire to be released from API, while many others related to the discussion in some way but were incoherent, such as when B.G. interrupted testimony about his eating and clothing with: "I don't feel that I need any help from Papa John's or Pizza Hut, so I guess I'll be on my way" and "Look at him bothering Wendy's for shopping . . . help the princess up or he's going to

---

[1]     B.G. requested that we use his initials rather than a pseudonym to protect his privacy.

get hurt." At one point during the hearing B.G. abruptly left the courtroom at API but returned shortly thereafter.

Dr. Pace testified that he had diagnosed B.G. with chronic schizophrenia and that, at the time of the hearing, this condition manifested in disorganized, incoherent speech, responses to internal stimuli, a lack of insight, and a lack of care for activities of daily living such as hygiene and grooming. He said B.G. had previously been diagnosed at API with the same condition, then subsequently released.

Dr. Pace testified regarding his concern for B.G.'s ability to take care of himself. He explained that when he visited B.G. the morning of the hearing, he noticed that B.G.'s hair was "all askew" and that B.G. was walking around barefoot wearing a dirty T-shirt. Dr. Pace believed that B.G. had trouble advocating for himself because he had not requested a clean shirt or footwear. Dr. Pace did not think that B.G. was sufficiently goal-directed to go to a store, figure out how to get money, or use the bus to get to a shelter. Given B.G.'s condition, Dr. Pace was also concerned about B.G.'s ability to protect himself from the elements.

Regarding necessary treatment, Dr. Pace testified that B.G. needed to improve the organization of his thinking, improve his activities of daily living, and take medications consistently. Although B.G. had begun to take medication at API just the day prior to the hearing, Dr. Pace could not ascertain whether B.G. thought he needed his medications because Dr. Pace could not "get that level of discourse with him," meaning that Dr. Pace could not "really engage with him to ascertain whether he thinks he needs the medication." Dr. Pace also noted that, according to the petition to hospitalize B.G. for evaluation, B.G. had not been taking his medications for several months and this had led to deterioration from his baseline. Dr. Pace did not believe that B.G. could get the necessary treatment in an outpatient environment.

Dr. Pace also briefly testified about B.G.'s reported aggressiveness, again

referencing the petition to hospitalize B.G. for evaluation, but he noted that B.G. had not been aggressive while at API.

After Dr. Pace's testimony, B.G. made a short statement that expressed his appreciation for being able to stay at API and then seemed to paraphrase song lyrics:

> I'm very glad I was allowed to stay here and I appreciate the business of being able to stay here and visit with the people in API, but that's between me and them, and I appreciate you talking today. And I hope you have your business well at hand. And carry on well, wayward son, and there'll be peace when you are (indiscernible - voice lowered). Don't you cry over it anymore.[2]

B.G.'s counsel asked if B.G. wanted to say anything else, but he did not elaborate any further.

The master recommended denying the commitment petition, finding that although B.G. clearly suffered from mental illness, there was "very little, if any, credible evidence of harm to others" and insufficient evidence to establish that B.G. was gravely disabled. The master also found that Dr. Pace's testimony failed to establish that commitment was the least restrictive alternative for treating B.G.'s condition.

The State objected, arguing that B.G. was gravely disabled because clear and convincing evidence showed he was "not able to attend to his basic needs such that he [would be] in immediate danger if released." The State also argued that commitment was the least restrictive treatment alternative in light of B.G.'s history of noncompliance with medication on an outpatient basis, and the corresponding substantial deterioration in his condition prior to this hospitalization. The State argued that an outpatient treatment and medication regimen was therefore not a feasible less restrictive alternative.

---

[2] This appears to paraphrase the lyrics of a 1970s song recorded by Kansas. *See Kansas – Carry On Wayward Son (Official Audio)*, YOUTUBE (Dec. 5, 2012), https://www.youtube.com/watch?v=2X_2IdybTV0.

The State did not object to the master's conclusion that insufficient evidence supported finding that B.G. was likely to cause harm to others.

After conducting a de novo review of the record,[3] the superior court sustained the State's objections and issued a 30-day commitment order. The court concluded that there was "clear and convincing evidence that [B.G. was] gravely disabled under AS 47.30.915(9)(A)";[4] that there was reason to believe B.G.'s condition could be improved through commitment to API for treatment; and that commitment was the least restrictive alternative available to meet B.G.'s needs.

In support of these conclusions, the court found that B.G. could not "handle his basic needs" and that it was "not currently possible to have a conversation with [B.G.] to engage with him to determine whether he thinks he needs to take his medications or otherwise has a mental illness." The court noted that this was consistent with B.G.'s behavior during the hearing, where he "constantly interrupted with incoherent mumbling and words." The court further found that "Dr. Pace testified credibly that [B.G. was] not currently capable of figuring out how to get money, food, housing, or transportation outside of a controlled environment." Regarding less restrictive alternatives, the court found that although "[t]here was no evidence provided about the availability of housing or an outpatient treatment provider relationship with [B.G.]," his treatment needs could not "be met right now in an outpatient environment (even if there were one identified) because [he was] not taking his medications

---

[3]     *See* Alaska R. Civ. P. 53(d)(2)(B) (requiring that the superior court conduct de novo review in the event of objections to the master's recommendation).

[4]     This section defines "gravely disabled" as "a condition in which a person as a result of mental illness . . . is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken." AS 47.30.915(9)(A).

independently."

B.G. appeals[5] the superior court's finding that his condition could reasonably be expected to improve with treatment and the court's conclusion that commitment was the least restrictive treatment available. He does not challenge the court's conclusion that he was gravely disabled.

## III. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding A Reasonable Expectation That B.G.'s Condition Could Improve With Treatment.

"[W]hen the State seeks to commit a mentally ill person on a theory of grave disability, it must prove a reasonable expectation of improvement with treatment" by clear and convincing evidence.[6] B.G. argues that the superior court erred when it found that his condition could improve with treatment. We review this factual finding "for clear error, and 'we reverse only if our review of the record leaves us with a definite and firm conviction that a mistake has been made.' "[7]

B.G. contends that the State's evidence was too vague to meet its evidentiary burden, and particularly that Dr. Pace lacked enough information about B.G.'s prior baseline to determine whether he could improve with treatment. B.G. points out that Dr. Pace could not recall in his testimony whether B.G. had improved before his

---

[5]     While the 30-day commitment order has lapsed, the public interest exception to the mootness doctrine permits our review of B.G.'s appeal. *See In re Hospitalization of Naomi B.*, 435 P.3d 918, 930 n.60 (Alaska 2019) ("[R]egardless of the type of involuntary admission or medication proceeding being challenged or the legal basis for appeal, the public interest exception authorizes us to consider any such appeal on the merits.").

[6]     *In re Hospitalization of Darren M.*, 426 P.3d 1021, 1030 (Alaska 2018).

[7]     *Id.* at 1027 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d at 924-31).

prior discharge from API, and that the only other testimony about B.G.'s baseline was based on Dr. Pace's review of the ex parte petition for hospitalization, which was not admitted as evidence.

But the State need not prove that B.G.'s condition *would* improve with treatment, as such a showing "would be a tall order, and one that medical science might struggle to fulfill even under ideal circumstances."[8]  And B.G. concedes that Dr. Pace was entitled to rely on the evidence supporting the order for hospitalization for evaluation in forming his expert opinion.[9]  Based on this evidence, Dr. Pace testified that prior to admission to API, B.G. had stopped taking his medications and subsequently deteriorated from his prior baseline.  Dr. Pace also testified that B.G. had recently begun taking medication at API and that continuing to take medication and participating in activities at API would help B.G. meet his treatment goals.  We conclude that the superior court did not clearly err by relying on Dr. Pace's testimony to find a reasonable expectation that B.G.'s condition could improve with treatment.

**B.** **The Superior Court Did Not Err By Concluding That Commitment Was The Least Restrictive Treatment Available For B.G.'s Condition.**

Before a court can order a mentally ill person involuntarily committed, the State must also prove "by clear and convincing evidence that there are no less restrictive alternatives available [for treatment]."[10]  "A 'least restrictive alternative' is 'no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient' and does not restrict an individual except as reasonably necessary to provide

---

[8]     *Id.* at 1031.

[9]     *See* Alaska R. Evid. 703 ("Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field."); Alaska R. Evid. 705 ("The expert may . . . disclose . . . the underlying facts or data.").

[10]     *In re Hospitalization of Rabi R.*, 468 P.3d 721, 735 (Alaska 2020).

treatment and protect the patient and others from physical injury."[11]  This showing "is a constitutional prerequisite to involuntary hospitalization" because such a deprivation of liberty "places a substantial burden on a fundamental right."[12]

We review the factual findings underlying the superior court's least restrictive alternative conclusion for clear error.[13]  And we review de novo the mixed question of fact and law presented by the court's ultimate conclusion that involuntary commitment was the least restrictive treatment available.[14]

B.G. argues that the evidence presented by the State was too conclusory to support the determination that commitment was the least restrictive treatment available for his condition.  B.G. notes that Dr. Pace made no effort to contact any individuals with knowledge of B.G.'s life in the community, such as outpatient treatment providers, before concluding that outpatient treatment was not a feasible less restrictive alternative. In fact, Dr. Pace testified that he was not aware of any outpatient providers for B.G., even though one of B.G.'s outpatient treatment providers filed the petition to hospitalize B.G. for evaluation.

Dr. Pace's apparent lack of knowledge and exploration of potential housing and outpatient treatment options for B.G. is troubling.  B.G. is correct that it is the State's burden to present clear and convincing evidence that there are no feasible less restrictive alternatives to confinement; the State is less likely to meet this burden when it does not

---

[11]     *In re Hospitalization of Danielle B.*, 453 P.3d 200, 203 (Alaska 2019) (quoting AS 47.30.915(11)).

[12]     *In re Naomi B.*, 435 P.3d at 933.

[13]     *In re Danielle B.*, 453 P.3d at 202 (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[14]     *Id.* at 203.

explore what potential alternatives may be available.

Still, any potential less restrictive alternative treatment must be feasible.[15] Outpatient treatment may not be feasible when expert testimony demonstrates that a respondent cannot function independently in the community, needs consistently administered medications for treatment, and lacks insight into the respondent's own behavior and corresponding need for treatment.[16] In this case, the superior court found that B.G. "has problems organizing his thoughts and is unpredictable"; that he was not able to "function independently or live safely outside of a controlled environment"; that it was not possible to "engage with him to determine whether he thinks he needs to take his medications or otherwise has a mental illness"; that his treatment needs included "tak[ing] his medications consistently"; that he was "not taking his medications independently" in an outpatient environment; and that he had only "taken his medications on a couple occasions since he arrived at API." Although Dr. Pace's expert testimony was limited, we conclude that these findings are not clearly erroneous.

Reviewing the court's ultimate conclusion de novo, we agree that clear and convincing evidence showed commitment at API was the least restrictive treatment available for B.G.'s condition. Prior to his hospitalization for evaluation, B.G. had

---

[15]     *In re Naomi B.*, 435 P.3d at 932-33.

[16]     *See In re Hospitalization of Mark V.*, 375 P.3d 51, 59-60 (Alaska 2016) (affirming commitment order based on findings that respondent "needed medications and [wa]s [u]nab[le] to follow an outpatient regimen," could not "understand his situation, symptoms or current illness," and "would be entirely unable to fend for himself independently"), *overruled on other grounds by In re Naomi B.*, 435 P.3d at 924-31; *In re Hospitalization of Joan K.*, 273 P.3d 594, 602 (Alaska 2012) (affirming commitment order based on testimony from mental health professionals that outpatient treatment "require[s] a patient stable enough to have insight into one's behavior" and that respondent lacked sufficient insight and perspective about her condition and need for treatment).

stopped taking medication in an outpatient environment, causing his condition to significantly deteriorate. B.G.'s condition at the time of the commitment hearing supported Dr. Pace's concerns that B.G. would be unable to care for himself and live safely outside of a controlled environment. B.G.'s condition could reasonably be expected to improve with consistent medication, but he had only recently started taking medications at API, and those medications could take up to several weeks to become effective. Dr. Pace's testimony and B.G.'s conduct at the hearing further demonstrated that B.G. lacked insight into his condition and need for medication, so he could not be relied on to continue taking medication in an outpatient environment. Because outpatient treatment was not feasible under these circumstances, the superior court did not err by concluding that commitment was the least restrictive treatment available to meet B.G.'s treatment needs.

## IV.    CONCLUSION

We AFFIRM the superior court's commitment order.