NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity of the Hospitalization of | ) ) ) Supreme Court No. S-18390 |
| QUADE M. | ) ) Superior Court No. 3AN-21-02542 PR ) ) ) MEMORANDUM OPINION ) AND JUDGMENT* ) ) No. 1985 – August 16, 2023 ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Hugh P. Dowell, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

A man was involuntarily committed to Alaska Psychiatric Institute (API) for 90 days. He appeals the commitment order, arguing that the superior court erred when it found that he was gravely disabled and that there was a reasonable expectation

---

\*     Entered under Alaska Appellate Rule 214.

his mental health would improve with further treatment. Finding no error, we affirm the commitment order.

## II. FACTS AND PROCEEDINGS

### A. Facts

Quade M.[1] suffers from schizoaffective disorder, bipolar type, as well as polysubstance abuse, antisocial personality disorder, and borderline intellectual functioning. Schizoaffective disorder is both chronic and degenerative, meaning that although it can be managed and its progress slowed, Quade will never be cured and will continue to deteriorate. At the time of the commitment hearing, Quade had had over 300 encounters with the police and had been committed to and discharged from API 48 times.

The commitment proceeding at issue is part of what was described by Quade's primary treatment provider as a recurring cycle. Quade is released from API, discontinues his antipsychotic medication, and, because he has been banned from all shelters in the city, lives outdoors. He then "usually breaks into someone's house for food and warmth, gets arrested, [and] goes to jail." The criminal charges are dismissed and "[h]e gets committed back to API." At that point he is usually underweight and undernourished. At API he is put on medication, stabilizes, and is eventually discharged, at which point the cycle repeats. According to the treatment provider, Quade has spent approximately 80 percent of the last four years either at API or incarcerated.

Quade is described as "extremely psychotic" when unmedicated. He suffers from disorganized thinking, which means he cannot understand how his mental illness impacts his life and wellbeing. He has volatile mood swings and can be aggressive. He can also be hypersexual — exposing or touching himself in public, doing "some inappropriate things with children," and making lewd sexual remarks to

---

[1]     We use a pseudonym to protect Quade's privacy.

women, which has led to a 10-foot boundary rule between him and female staff at API. While he has not physically harmed anyone at API, he has had to be secluded or deescalated with an injectable medication for assaultive behavior.

When Quade is medicated, his baseline is "still psychotic but it's a much lower level." At API he takes his medications fairly consistently, receives adequate meals, is under 24-hour medical and nursing care, and receives long-lasting injectable medication as necessary. With medication he is better able to think and communicate linearly — he is more organized and less assaultive, and his disposition improves. But he does not seem to comprehend the nature of his commitment at API; he continually states his desire to leave and repeatedly tells staff that "the judge said [he] could go."

## B. Proceedings

### 1. The 90-day hearing

Nearing the end of a 30-day commitment, the State moved to have Quade committed for an additional 90 days. A superior court master heard testimony from advanced nurse practitioner Gerald Martone, who was Quade's primary medical provider, and one of Quade's social workers at API.

Martone, reflecting on how his patient's condition had changed since the 30-day hearing, testified that Quade remained "gravely disabled" and "unable to care for himself outside an institutional setting." He did not believe Quade would be safe in the community if released because of his pattern of leaving API only to be recommitted soon after and because of his unwillingness to go to appointments or take medication to manage his condition in an outpatient setting.

Martone believed that this most recent stay at API had improved Quade's condition, noting that Quade had gained weight since initially appearing "undernourished" when admitted, that he had "slight improvement in terms of his volatility," and that consistent medication had slightly improved his impulse control. Martone also indicated, however, that many of Quade's behavioral problems, such as intrusiveness, loudness, and hypersexuality, persisted, and he suggested that Quade

would see more improvement if he took his mood stabilizer medication more consistently.

Martone testified that "as a clinical matter" Quade would likely "continue to improve" if he remained at API, though he would inevitably deteriorate when released. Martone described the expected improvement: "It will not be dramatic. He will never be cured. But his impulsivity, his tolerance for frustration, his social inappropriateness I believe will improve because it has consistently improved." Martone explained that following his recent release from a 90-day commitment Quade stayed out of his usual cycle of incarceration and recommitment "for a good period of time" in part because of the long-lasting effect of two different injectable antipsychotic drugs he had received while at API. But Martone cabined his optimism by recognizing that Quade's condition is extreme, lifelong, and chronic; although it can be managed, it can never be cured.

Martone also opined that he "want[ed] to believe [Quade] can do better." He said that the lack of safe housing for individuals with mental illnesses was "society's failure," and he considered it inhumane and an "indignity" to Quade to release him into the community. He regretted that Quade disliked being in an institution, explaining that he wished there were an alternative but that releasing Quade from API would be "deleterious" and "not . . . in his best interests."

Finally, Martone expressed concern for Quade's safety if discharged from API in February given the likelihood that he would lack shelter from the extreme cold "unless he breaks into someone's home." Martone described Quade on one of his earlier admissions as having frostbite so severe that he almost lost part of his hand; Martone worried that it would happen again.

Quade's social worker at API testified next, explaining that he had interacted with Quade during five of Quade's stays, spanning several years. The social worker described Quade's baseline when medicated as "still psychotic but it's a much lower level"; "he gets to the point where he can communicate and he's not yelling at

people and he has a linear thought process." The social worker confirmed that off medication Quade was "extremely psychotic," "very aggressive, threatening, yelling, [and] very incoherent." But Quade was then doing as well as he ever did; the long admission and "having . . . stability for . . . over two months has been good for him."

## 2. The master's findings and recommendation

The master found that Quade was gravely disabled, noting that it was not a particularly close question. To support this finding, the master cited evidence that Quade could not attend to his basic needs or survive in the winter. She found that Quade was "unable to care for himself outside of an institutional setting."

The master credited Martone's testimony that Quade's condition could still improve. She observed that Quade, when medicated, can verbalize his needs, is less psychotic, and can communicate linearly without aggressiveness and yelling. But absent medication he would "continue to suffer the severe and abnormal extreme psychosis that he experiences." Ultimately, the master recommended that the State's 90-day petition be granted.

## 3. The superior court's decision

Quade objected to the recommendation. He argued that there was insufficient evidence to support the findings that he was gravely disabled, that he was unable to provide for his basic needs if discharged immediately, and that he was incapable of surviving safely on his own. He also argued that the master mistakenly applied a "best interests" test that is irrelevant in involuntary commitment cases. Finally, Quade objected to the master's finding that continued commitment could improve his condition.

The superior court overruled Quade's objections. The court found that the master's findings were well supported by evidence that Quade was "extremely psychotic," had "no insight into his illness," "fail[ed] to adequately nourish himself," lacked "access [to a] shelter as a result of his illness," and engaged in "hypersexual aggression . . . with no awareness of the consequences of his behavior." The court

found, "Taken together, this conduct does not reflect eccentricity or flouting social norms or even a personal choice and instead reflects severe distress and a significant impairment of his ability to function independently." The court concluded that the master had applied the correct legal standard and had properly credited Martone's testimony that Quade's condition could improve with further treatment.

Quade appeals.

## III. STANDARD OF REVIEW

"We review the superior court's factual findings in involuntary commitment or medication proceedings for clear error and reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[2] We review de novo whether the factual findings meet the statutory requirements for involuntary commitment.[3]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding That Quade Was Gravely Disabled.

A 90-day commitment order depends in part on a finding, by clear and convincing evidence, that the person "is mentally ill and as a result is likely to cause

---

[2]     *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[3]     *In re Hospitalization Rabi R.*, 468 P.3d 721, 730 (Alaska 2020).

harm to self or others, or is gravely disabled."[4] Alaska Statute 47.30.915(9)[5] defines

"gravely disabled" as "a condition in which a person as a result of mental illness"

> (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or
>
> (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently[.][6]

The superior court did not err by finding Quade gravely disabled under either definition.

First, there was sufficient evidence that Quade was in danger of physical harm as addressed by AS 47.30.915(A). He experienced homelessness when he left API and lived outdoors. Although those circumstances in themselves are not harmful, there was also evidence that on his own he was unable to find food, shelter, or other basic necessities, and he returned to API appearing "undernourished" and "unkempt." In the past he had suffered severe frostbite, and his discontinuation of medication upon

---

**4**    AS 47.30.755(a). Clear and convincing evidence "demands 'a firm belief or conviction about the existence of a fact to be proved.' " *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1192-93 (Alaska 2013) (quoting *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000)). It "has been characterized as evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt." *Id.* at 1193 (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 530 n.12 (Alaska 2004)).

**5**    We recognize that the legislature changed the definition of "gravely disabled" while this appeal was pending. *See* AS 47.30.915(9), *as amended by* ch. 41, § 30, SLA 2022. The new law does not contain a retroactivity clause and therefore does not apply here. *See* AS 01.10.090 ("No statute is retrospective unless expressly declared therein.").

**6**    Former AS 47.30.915(9) (2021).

his release worsened his degenerative schizoaffective disorder. The evidence of a "danger of physical harm" was sufficient to show grave disability.[7]

There was also sufficient evidence of grave disability under the second definitional prong. We have held that the primary inquiry for grave disability under a subsection (B) analysis is whether an individual is "unable 'to live safely outside of a controlled environment.' "[8] For the same reasons given above — that Quade lacks consistent access to housing and food, that he is unlikely to take his medication on his own, that he lacks insight into his illness, and that he repeatedly cycles through discharge from API and readmission — the evidence supports a finding that he is unable to live safely outside of a controlled environment like API.[9] Quade suffers from a particularly severe case of schizoaffective disorder; unmedicated he deteriorated from

---

[7]     *See In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 87-89 (Alaska 2012) (affirming finding that individual was "gravely disabled" in part because of his tendency to discontinue medication once released from hospitalization); *see also In re Hospitalization of Naomi B.*, 435 P.3d at 932 (affirming finding that individual was "gravely disabled" when individual did not have access to housing and "could not be expected to find housing on her own" due to her mental illness, it was unclear how she ate or showered without API providing for her, and she refused her medications).

[8]     *See In re Rabi R.*, 468 P.3d at 733 (quoting *In re Jeffrey E.*, 281 P.3d at 87); *see also In re Naomi B.*, 435 P.3d at 932 ("[F]or a court to properly commit an individual under AS 47.30.915(9)(B), there must be 'a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment.' " (quoting *In re Stephen O.*, 314 P.3d at 1193)); *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d at 918 ("[A finding of grave disability under prong (B)] is concerned with a more passive condition, whereby the respondent is so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life.").

[9]     *See In re Jeffrey E.*, 281 P.3d at 88-89 (affirming finding of grave disability when it was unclear how individual would access basic necessities like food, and individual lacked insight into his mental illness and "would probably go off his medication and get back into the same situation rather quickly" if not hospitalized, causing his condition to deteriorate).

"less psychotic" to "extremely psychotic," rapidly eroding his ability to function independently. Because the evidence supports a finding of grave disability under the subsection (B) definition as well, we see no error in the superior court's decision.

Quade argues, however, that the superior court adopted the wrong standard for civil commitments, focusing on his best interests rather than evidence of grave disability. Quade bases this argument on the fact that Martone's testimony, at times, indicated his personal focus on Quade's best interests, deeming it inhumane to turn him out into the community without assuring him a safe place to live.[10]

But as discussed above, there is ample evidence supporting the court's finding under a clear and convincing evidence standard that Quade was gravely disabled. The superior court recognized that Martone's testimony at times "reflected deep compassion" for his patient but that the master nonetheless "very clearly distinguished between the [witness's] sense of obligation to [Quade] and his interests and the legal standard for commitment." The testimony notwithstanding, the court was obligated to use the correct legal standard and order Quade's commitment based on the evidence of grave disability, and it appears that it did so. We see no error in the superior court's analysis or conclusion.

### B. The Superior Court Did Not Err By Finding A Reasonable Expectation That Quade Could Improve With Continued Treatment.

When the State seeks to commit a mentally ill person on a theory of grave disability, it must show clear and convincing evidence of a reasonable expectation of improvement with treatment.[11] This showing does not require the State to prove that

---

[10] Martone testified: "I wish I believed [Quade] would thrive and I could discharge him. . . . But I believe in my professional opinion that it will not be in his best interests." He also stated that he "want[ed] to believe [Quade] can do better. . . . [It is] society's failure to provide a safe context for people with mental illness. And for [Quade] to be out in the community is an indignity to him."

[11] *In re Hospitalization of Darren M.*, 426 P.3d 1021, 1030 (Alaska 2018); *see also* AS 47.30.655(6).

further treatment "definitely would improve" a person's condition, only that there is reason to believe treatment *could* improve the condition.[12] "We review the superior court's chance-of-improvement finding for clear error."[13]

In making this finding, the superior court relied primarily on Martone's testimony that he believed Quade could improve. Martone based this opinion on the fact that Quade had shown improvement since his 30-day commitment; in that time he gained weight, became less volatile, and took his medications fairly consistently, slightly improving his impulse control. In Martone's clinical opinion Quade would "continue to improve," though the improvement was unlikely to be "dramatic." Martone cited Quade's history of being able to survive longer on his own after an earlier 90-day commitment that included long-lasting antipsychotic medications.

Quade relies on the social worker's testimony that he was at his baseline, that he had been released in the past when at his baseline, and that the witnesses' hopes that Quade could still improve were not sufficient to demonstrate a reasonable expectation of further improvement with continued treatment. Although the social worker testified that "this is one of the best [he had] seen [Quade]," this testimony does not preclude the prospect of further improvement with treatment. Indeed, the social worker acknowledged that a longer commitment "ha[d] been good for [Quade]." And Martone testified expressly that he "expect[ed] that [Quade would] continue to improve . . . . [H]is impulsivity, his tolerance for frustration, his social inappropriateness I believe will improve because it has consistently improved." The court found this to be a "diagnostic and clinical statement versus a humanitarian and moral statement," which we have no reason to doubt. And when the social worker was asked directly whether

---

[12]     *In re Darren M.*, 426 P.3d at 1031.

[13]     *In re Hospitalization of Meredith B.*, 462 P.3d 522, 527 (Alaska 2020).

he intended "to contradict any of Mr. Martone's clinical opinions about [Quade]," he responded, "Oh, no, not at all."

We have upheld chance-of-improvement findings in the past based on testimony about an individual's past improvement,[14] and we have disregarded the degree of improvement; the evidence must show that an individual "*could* be improved by the course of treatment sought," not that the individual necessarily "*would* improve with treatment."[15] Here, the court could reasonably rely on the testimony of both API witnesses to find a reasonable expectation that, based in part on past experience, commitment could improve Quade's mental condition, albeit slightly. We see no clear error in the court's findings.

## V. CONCLUSION

We AFFIRM the superior court's involuntary commitment order.

---

[14] *In re Darren M.*, 426 P.3d at 1031.

[15] *In re Meredith B.*, 462 P.3d at 527 (emphasis in original).